# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued January 14, 2021         Decided April 16, 2021

No. 20-1044

COMMUNICATIONS WORKERS OF AMERICA, AFL-CIO,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

T-MOBILE USA, INC.,
INTERVENOR

---

On Petition for Review of an Order of
the National Labor Relations Board

---

*Glenda L. Pittman* argued the cause for petitioner. With her on the briefs was *Jennifer Ann Abruzzo*.

*Gregory Lauro*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Peter B. Robb*, General Counsel, *Ruth E. Burdick*, Acting Deputy Associate General Counsel, *David Habenstreit*, Assistant General Counsel, and *Kira Dellinger Vol*, Supervisory Attorney.

*Mark Theodore* was on the brief for intervenor T-Mobile USA, Inc. in support of respondent.

Before: ROGERS and TATEL, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: This case concerns an organization called "T-Voice," which the wireless phone provider T-Mobile established in its customer-service call centers. The Communications Workers of America ("CWA") petitions for review on the ground that T-Voice is an improper "company union" unlawfully dominated and supported in violation of Section 8(a)(2) of the National Labor Relations Act. We grant the petition and remand the case to afford the Board an opportunity to reconcile two lines of its "dealing with" precedent.

## I.

T-Mobile operates 17 call centers in the United States. At each center, T-Mobile employs customer service representatives ("CSRs") who handle calls from customers. Since 2009, CWA has attempted to organize T-Mobile CSRs. During the organizing campaign, CWA has filed a number of unfair labor practice charges, some of them successful. *See, e.g.*, *T-Mobile USA, Inc.*, 369 N.L.R.B. No. 50 (Apr. 2, 2020); *T-Mobile USA, Inc.*, 365 N.L.R.B. No. 15 (Jan. 23, 2017). To date, CWA has not filed a representation petition for an election among the CSRs.

T-Mobile launched T-Voice at six of its call centers in January 2015 and expanded the program to cover all T-Mobile call centers later that year. The charter for the group defined its mission: "Enhance Customers and Frontline experience by identifying, discussing, and communicating solutions for

roadblocks for internal and external customers. Provide a vehicle for Frontline feedback and create a closed loop communication with T-Mobile Sr. Leadership Team." Gen. Couns. Ex. 94 at T0001053. The charter stated that there would be three T-Voice representatives at each call center, who would serve a six-month term that was later extended to nine months. When T-Voice was rolled out in June 2015, a T-Mobile Executive Vice President emailed all CSRs:

> T-Voice is your voice — it's made up of Frontline Representatives from each call center . . . . Their job is to raise Frontline and customer pain points to ensure they are resolved and then results are communicated back to the Frontline. . . . You can raise issues by reaching out to your T-Voice representatives. Be vocal, let us know what you think.

Gen. Couns. Ex. 2. Similarly, a manager at T-Mobile's call center in Springfield, Missouri told prospective T-Voice representatives that they would be "responsible for gathering pain points from your peers in Springfield, representing those issues to local and national leadership teams, and tracking and communicating resolution back to the team." Gen. Couns. Ex. 38.

As presaged by the charter and email, a key task for T-Voice representatives was to collect complaints from CSRs and communicate them to management. Customer pain points indirectly affect CSRs because they generate service calls and customer irritation that the CSRs are responsible for handling. By contrast, employee pain points directly concern terms and conditions of employment such as bonus compensation and work schedules. T-Voice representatives collected pain points through a variety of different methods. During "table days," T-Voice representatives set up a table and talked to fellow

CSRs about new devices, promotions, or pain points. There were also physical suggestion boxes and email addresses to which CSRs could submit pain points. T-Voice representatives also collected pain points through team meetings, especially a type of meeting called a "knowledge check," during which representatives met with small groups of CSRs and checked their awareness of developments such as the release of a new phone.

T-Voice representatives entered the collected pain points into a Microsoft Sharepoint database substantially as conveyed by the submitter, subject to minor grammar or clarifying edits. The Sharepoint database was used to track pain points and they were assigned to managers for consideration and tagged according to their status, such as whether action had been taken. In addition, T-Voice representatives participated in various meetings: local meetings for planning the T-Voice representatives' schedule, and regional and national meetings by telephone from multiple call centers. Regional meetings were primarily focused on sharing best practices for local T-Voice programs but might occasionally have involved discussions of pain points. One email referred to a regional meeting discussion of "what people think about" a particular change that T-Mobile made to its calculation of call resolution time, a metric used to evaluate CSRs' performance. Gen. Couns. Ex. 90, at T0005060. T-Mobile used several metrics to assess CSRs' performance, such as whether the customer called back shortly following the call, and CSRs' metrics affected their bonus compensation and ability to work their preferred schedule.

National meetings each included a focus group run by a T-Mobile manager, who circulated agendas and post-meeting summaries. For example, a pre-meeting email asked T-Voice representatives to "review and begin getting feedback from

your sites" and "come ready to share your site ideas." Gen. Couns. Ex. 91, at T0001383. At the August 2015 national meeting, the agenda included a discussion of changes T-Mobile was making to a customer-satisfaction metric, which was identified as follow-up on a top pain point from July. Presentation slides from the meeting explained that certain categories of surveys would no longer be included in CSRs' customer-satisfaction scores. A T-Voice newsletter circulated two days after the meeting stated that "T-Voice has been a machine in listening to our Frontline teams and ensuring their voices are heard" and stated that "T-Voice has worked . . . to help improve the [customer-satisfaction survey] experience." Gen. Couns. Ex. 90, at T0000662.

T-Mobile also held in-person T-Voice summits in October 2015 and May 2016. These two-day summits were attended by all T-Voice representatives plus many senior managers. The 2015 summit included break-out sessions where T-Mobile Vice Presidents each conducted a focus group with 10 to 15 T-Voice Representatives on topics including "Employee Engagement / T-Mobile Culture," "Metrics," "Systems / Tools," and "Frontline Readiness." *Id.* at T0004960. Notes from the metrics focus group indicate that T-Voice representatives made proposals for changes to calculations of CSR metrics, such as dropping the high and low scores on customer-satisfaction surveys and that calls less than 45 seconds should be excluded from calculation of another metric. The 2016 summit included T-Voice representatives identifying an onerous process for restoring customer access to locked accounts as a top pain point for discussion. After the summit, T-Mobile announced that it was "fixing the process." Gen. Couns. Ex. 91, at T0001351.

CWA filed an unfair labor practices charge in February 2016, amended in June 2016. The Board's General Counsel

filed a complaint alleging, as relevant, that: (1) T-Voice was a labor organization within the meaning of Section 2(5) of the National Labor Relations Act, (2) T-Mobile supported T-Voice in violation of Section 8(a)(2), and (3) its operation of T-Voice constituted solicitation of grievances during an ongoing organizing campaign and an implied promise to remedy those grievances, in violation of Section 8(a)(1).

An ALJ held a four-day trial and ruled, as relevant, that T-Voice was a labor organization T-Mobile dominated and supported in violation of Section 8(a)(2), and that T-Mobile's operation of T-Voice constituted solicitation of grievances and implied promises to remedy those grievances during an ongoing organizing campaign. T-Mobile filed exceptions. On September 30, 2019, a three-member Board essentially reversed the ALJ, ruling that T-Voice was not a labor organization and its operation did not violate Section 8(a)(2). Further, given the years-long duration of CWA's organizing campaign, T-Mobile's creation of T-Voice did not warrant an inference that it would reasonably have the tendency to erode employee support for union organizing. Because the Board found T-Voice did not "deal with" T-Mobile as required for it to be a "labor organization," the Board did not address whether any pain points submitted by T-Voice concerned conditions of work or other statutory subjects. CWA petitions for review of the Board's decision. This court has jurisdiction under 29 U.S.C. § 160(f).

## II.

This court "will uphold a decision of the Board unless it relied upon findings that are not supported by substantial evidence, failed to apply the proper legal standard or departed from its precedent without providing a reasoned justification for doing so." *Bob's Tire Co. v. NLRB*, 980 F.3d 147, 153

(D.C. Cir. 2020) (quoting *Int'l Longshore & Warehouse Union v. NLRB*, 890 F.3d 1100, 1107 (D.C. Cir. 2018)). Although this standard of review is deferential, the court "will not 'rubber stamp Board decisions,' and . . . will remand where a Board order 'reflects a lack of reasoned decisionmaking.'" *Tramont Mfg., LLC v. NLRB*, 890 F.3d 1114, 1119 (D.C. Cir. 2018) (alterations omitted) (first quoting *Consolidated Commc'ns, Inc. v. NLRB*, 837 F.3d 1, 7 (D.C. Cir. 2016); and then quoting *Penrod v. NLRB*, 203 F.3d 41, 46 (D.C. Cir. 2000)). A Board decision does not rest on reasoned decisionmaking if "it fails to offer a coherent explanation of agency precedent." *NBCUniversal Media, LLC v. NLRB*, 815 F.3d 821, 823 (D.C. Cir. 2016).

## A.

Section 7 of the Act gives employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. Section 8(a)(1) provides that it shall be an unfair labor practice "to interfere with, restrain, or coerce employees in the exercise" of those rights. 29 U.S.C. § 158(a)(1). An employer's statement to an employee violates Section 8(a)(1) if "considering the totality of the circumstances, the statement has a reasonable tendency to coerce or to interfere with those rights." *Progressive Elec., Inc. v. NLRB*, 453 F.3d 538, 544 (D.C. Cir. 2006) (internal quotation marks omitted) (quoting *Tasty Baking Co. v. NLRB*, 254 F.3d 114, 124 (D.C. Cir. 2001)).

"Soliciting grievances is not in itself an unfair labor practice, but implicit or explicit promises to correct grievances may violate section 8(a)(1) because 'the combined program of

inquiry and correction' suggests that 'union representation is unnecessary.'" *Traction Wholesale Ctr. Co. v. NLRB*, 216 F.3d 92, 103 (D.C. Cir. 2000) (alteration omitted) (quoting *Reliance Elec. Co.*, 191 N.L.R.B. 44, 46 (1971)). Thus, "[a]n employer who has not previously solicited grievances but who begins to do so in the midst of a union campaign creates a 'compelling inference' that the employer is 'implicitly promising' to correct the problems." *Id.*

The Board has addressed the effect of a lapse in time between organizing activities and an employer's solicitation of grievances. In *Leland Stanford Jr. University*, 240 N.L.R.B. 1138 (1979), the union had filed representation petitions, and elections were held in 1975. *Id.* at 1139. After objections to the elections remained pending in 1977, the employer administered an employee opinion survey. *Id.* at 1139–41. The Board explained that "solicitation of employee grievances by an employer is not illegal unless accompanied by an express or implied promise of benefits *specifically aimed* at interfering with, restraining, and coercing employees in their organizational effort." *Id.* at 1143 (quoting *ITT Commc'ns*, 183 N.L.R.B. 1129, 1129 (1970)). Indeed, "for a considerable period of time, both prior and subsequent to the distribution of the survey, there was no active campaigning" by either the union or the employer, and "no election was scheduled or imminent." *Id.* at 1138 n.1. The case was therefore distinguishable from those in which "the timing of the employer's conduct made it reasonable to infer that the actions were taken for the purpose of eroding employee support for the union." *Id.* Consequently, the Board found that administration of the survey did not violate Section 8(a)(1).

The Board relied on *Leland Stanford Jr. University*, concluding that when T-Voice was implemented there was no outstanding representation petition and that "the record

contains no evidence of the Union's organizational efforts among customer service representatives at that time." Bd. Dec. at 9. The record therefore did not "warrant an inference that the T-Voice program was undertaken for the purpose of eroding employees' support for the Union." *Id.* CWA objects that the Board ignored record evidence that there was active organizing ongoing, including a January 2016 meeting at one call center to rebut union communications and various unfair labor practices charges filed by CWA.

The Board's decision was supported by substantial evidence. As to the January 2016 meeting, the Board acknowledged that such a meeting occurred. Although the Board did not discuss a document highlighted by CWA — talking points for the meeting stating that CWA had spent a great deal of time and money attempting to organize T-Mobile employees — that document is insufficient to undermine the Board's finding that the creation of T-Voice was not aimed at interfering with union organizing. So too with the unfair labor practice charges; although they furnish some evidence of ongoing organizing, they do not show that the Board lacked substantial evidence for its conclusion. CWA's organizing began in 2009, and there was a lack of record evidence that organizing was especially active when T-Voice was created six years later. Instead, there was substantial evidence for the Board's conclusion that T-Voice's solicitation of pain points would not reasonably have the tendency to undermine support for union representation.

## B.

Section 8(a)(2) of the Act makes it an unfair labor practice for an employer "to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it." 29 U.S.C. § 158(a)(2). A "labor

organization" is defined in section 2(5) of the Act to mean "any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." *Id.* § 152(5).

The parties' arguments concerning the alleged Section 8(a)(2) violation rest on dueling lines of Board precedent concerning the definitional requirement that a "labor organization" must exist for the purpose, at least in part, of "dealing with" an employer concerning conditions of work. In *NLRB v. Cabot Carbon Co.*, 360 U.S. 203 (1959), the Supreme Court reasoned that "dealing with" encompassed more than simply "collective bargaining," *id.* at 210–13, and therefore held that employee committees, which "made proposals and requests respecting such matters as seniority, job classification, job bidding, working schedules . . . and improvement of working facilities and conditions," were labor organizations within the meaning of the Act, *id.* at 213–14, 218. Since *Cabot Carbon*, Board decisions have attempted to draw the boundary between organizations engaged in "dealing with" an employer (which the employer therefore may not give support to or interfere with), from management practices that permissibly facilitate communication between employers and their employees. Essential to the Board's decision here was its view that an organization does not engage in "dealing with" an employer unless it makes "group proposals" to the employer; proposals from individual members of the group would not be sufficient. The Board grounds that view in four of its post–*Cabot Carbon* cases.

First, in *Electromation, Inc.*, 309 N.L.R.B. 990 (1992), the Board found that five "action committees" constituted labor

organizations and had been dominated by the employer. *Id.* at 997. The Board observed that the only purpose of the committees was "to address employees' disaffection concerning conditions of employment through the creation of a bilateral process involving employees and management in order to reach bilateral solutions on the basis of employee-initiated proposals." *Id.* The Board described such a bilateral process as "the essence of 'dealing with' within the meaning of Section 2(5)." *Id.*

In *E.I. du Pont de Nemours & Co.*, 311 N.L.R.B. 893 (1993), the Board further developed the concept of a "bilateral" process. *Id.* at 894. Here, the employer had set up seven committees (six on safety and one on employee fitness) and held safety conferences. *Id.* at 893. The Board concluded that the committees constituted "labor organizations" dominated by the employer in violation of Section 8(a)(2), but that the conferences were lawful information-gathering activities. *Id.* The Board described a spectrum of activities, ranging from bargaining to dealing to no-dealing and articulated three types of permissible non-dealing activity: brainstorming ideas, gathering information, and operating a "suggestion box."

> The term "bargaining" connotes a process by which two parties must seek to compromise their differences and arrive at an agreement. By contrast, the concept of "dealing" does not require that the two sides seek to compromise their differences. It involves only a bilateral mechanism between two parties. *That "bilateral mechanism" ordinarily entails a pattern or practice in which a group of employees, over time, makes proposals to management, management responds to these proposals by acceptance or rejection by word or deed, and compromise is not required.* If the evidence establishes such a pattern or

practice, or that the group exists for a purpose of following such a pattern or practice, the element of dealing is present. However, if there are only isolated instances in which the group makes ad hoc proposals to management followed by a management response of acceptance or rejection by word or deed, the element of dealing is missing.

Just as there is a distinction between "bargaining" and "dealing," there is a distinction between "dealing" and no "dealing" (and a fortiori no "bargaining"). For example, a "brainstorming" group is not ordinarily engaged in dealing. The purpose of such a group is simply to develop a whole host of ideas. Management may glean some ideas from this process, and indeed may adopt some of them. *If the group makes no proposals, the "brainstorming" session is not dealing and is therefore not a labor organization.*

Similarly, if the committee exists for the purpose of sharing information with the employer, the committee would not ordinarily be a labor organization. That is, *if the committee makes no proposals to the employer, and the employer simply gathers the information and does what it wishes with such information, the element of dealing is missing*, and the committee would not be a labor organization.

Likewise, under a "suggestion box" procedure where employees make specific proposals to management, there is no dealing because the proposals are made individually and not as a group.

*Id.* at 894 (emphases added) (footnotes omitted).

The Board in *E.I. du Pont* concluded that the committees did not fall within any of the non-dealing safe havens because they "involve[d] group action and not individual communication." *Id.* For example, the fitness committee proposed to management that tennis courts be constructed, which management rejected as too costly. *Id.* at 895. By contrast, the Board ruled that the employer's safety conferences, in which "employees shared their experiences on the topic" and "stated what they thought the ideal situation would be," constituted permissible brainstorming. *Id.* at 896. In reaching that conclusion, the Board noted there was no evidence the conference participants were acting in any sort of representative capacity for other employees. *Id.* at 897 & n.17.

Third, the Board pointed to *EFCO Corp.*, 327 N.L.R.B. 372 (1998), where it ruled that three committees were impermissibly dominated labor organizations, while a fourth committee, for screening employee suggestions, was a permissible information-gathering device. *Id.* at 372. Relying on *E.I. du Pont* and *Electromation*, the Board concluded that the first three committees engaged in "dealing with" the employer because they all made recommendations or proposals to the employer concerning issues within their ambit. *Id.* at 375–76. The suggestion screening committee was different. The employer had established a program under which "all employees were encouraged to submit suggestions and were informed that they would be paid $5 for each 'valid' suggestion." *Id.* at 374. The purpose of the screening committee was to "receive all suggestions, make recommendations on especially good suggestions, reject 'frivolous or otherwise invalid' ones, and submit remaining suggestions to the appropriate management group." *Id.* "In practice," however, "the Committee did not make decisions about the implementation of suggestions but merely decided which ones were not frivolous and forwarded them to the

relevant management group." *Id.* The Board found that the suggestion screening committee, unlike the others, "did not formulate proposals or present them to management." *Id.* at 376. Rather, it "performed a clerical or ministerial function which facilitated the [employer's] consideration of suggestions made by employees," essentially operating as "a screening portion of an employee 'suggestion box' program." *Id.* Because the committee did not engage in "weeding out proposals it d[id] not wish to advance and recommending others . . . , a process which would, in essence, put the committee in the position of making proposals to management," the Board concluded that it was not a labor organization within the meaning of the statute. *Id.*

Fourth, in *Polaroid Corp.*, 329 N.L.R.B. 424 (1999), the Board considered whether an "Employee-Owners' Influence Council" was a labor organization under the Act. *Id.* at 424. Management selected applicants to be on the council and led its meetings on topics such as the type of insurance benefits available to employees. *Id.* at 426–27. During meetings of the council, "members would 'throw out' ideas relating to the topic under consideration," the ideas would be discussed, and finally a poll would be taken to "determine the majority sentiment." *Id.* at 427. The Board concluded that the council was "not limited to a unilateral mechanism of brainstorming, information sharing, suggestion box, or survey of the employee population," but instead "functioned, on an ongoing basis, as a bilateral mechanism in which that group of employees effectively made proposals to management, and management responded to these proposals by acceptance or rejection by word or deed." *Id.* at 429. The Board rejected the employer's view that the council "presented only proposals of its individual members, rather than group proposals," pointing specifically to the employer's frequent use of polling. *Id.* at 429–30. Finding that the council was a "bilateral mechanism"

and that it acted in a representative capacity for other employees, the Board concluded that it was a labor organization within the meaning of the Act. *Id.* at 431–36.

The upshot of these cases is that an organization is not engaged in "dealing with" an employer unless the organization makes "group proposals," which would require some process for adopting or advancing them as proposals of the organization. CWA principally relies on two other Board cases that impose no "group proposals" requirement: *Dillon Stores*, 319 N.L.R.B. 1245 (1995), and *Reno Hilton Resorts Corp.*, 319 N.L.R.B. 1154 (1995). In *Dillon Stores*, management convened quarterly meetings of an employee committee at which elected employee representatives asked questions or made comments. 319 N.L.R.B. at 1246. Management responded either during the meeting, or in a follow-up report if necessary. *Id.* The committee did not have any process through which it came to consensus or agreement; instead, individual committee members made proposals by asking questions. *Id.* at 1250–51. The Board noted that employee members of the committee "act[ed] in the capacity of representatives of other employees." *Id.* at 1250. In concluding that the committee was a labor organization, the Board stated that "most, if not all, of the employee representatives' proposals and grievances concerned the employees' terms and conditions of employment; those proposals and grievances had been advanced collectively, on a representational basis; and [the employer] did entertain those proposals and grievances." *Id.* at 1252. That record, the Board concluded, was sufficient to establish the requisite "dealing." *Id.* The Board now maintains that *Dillon Stores* is consistent with a "group proposals" requirement because it refers to the proposals being "advanced collectively." Resp't Br. 28. But in context, that phrase means only that the proposals were made "on a representational basis," which is not clearly

distinguishable from the activities of the T-Voice representatives. Likewise, in *Reno Hilton* the Board found "quality action teams" to be labor organizations where "the QATs *or their members* made proposals or requests . . . ." 319 N.L.R.B. at 1156 (emphasis added).

The cases relied upon by the Board support its view that in order to be a labor organization within the meaning of Section 8(a)(2), the organization must make "group proposals." In *E.I. du Pont*, the Board wrote that dealing "ordinarily entails a pattern or practice in which a *group of employees*, over time, makes proposals." 311 N.L.R.B. at 894 (emphasis added). In *EFCO Corp.*, the suggestion-screening committee was found not to be a labor organization because it "did not formulate proposals or present them to management" but instead provided ministerial processing of "suggestions made by individual employees." 327 N.L.R.B. at 376. And in *Polaroid Corp.*, the Board emphasized that the employer had taken repeated polls of the committee to determine "majority sentiment," which was "tantamount to the group itself voting and presenting the majority view as its group proposal." 329 N.L.R.B. at 429.

Nonetheless, the Board had not previously held that an organization in which employee representatives make proposals to management does not constitute a labor organization unless those proposals are adopted by the group. Each of the organizations in the cases upon which the Board relies were found to be labor organizations within the meaning of the Act, except for the suggestion screening committee in *EFCO Corp. See Polaroid Corp.*, 329 N.L.R.B. at 429; *EFCO Corp.*, 327 N.L.R.B. at 375–76; *E.I. du Pont*, 311 N.L.R.B. at 895; *Electromation*, 309 N.L.R.B. at 997. Indeed, in *Electromation*, the Board explained that a group "may meet the statutory definition of 'labor organization' even if it lacks a

formal structure, has no elected officers, constitution or bylaws, does not meet regularly, and does not require the payment of initiation fees or dues." 309 N.L.R.B. at 994. Further, the "group proposals" requirement is in tension with the cases cited by CWA in which the Board found there was a labor organization without examining whether employee proposals had been embraced by the group through any formal process. *See Dillon Stores*, 319 N.L.R.B. at 1251–52; *Reno Hilton*, 319 N.L.R.B. at 1156–57.

The Board's reliance on a "group proposals" requirement therefore broke new ground. The court is left uncertain about what the record must show for the Board to find that an organization made group proposals, as opposed to engaging in mere brainstorming. Is it enough that an employee representative makes a proposal while acting in a representative capacity? That standard is suggested by the result in *Dillon Stores*, 319 N.L.R.B. at 1250–52, and by the fact that the Board noted the *E.I. du Pont* safety conference participants were not acting in a representative capacity, 311 N.L.R.B. at 897 n.17. It is also arguably suggested by the Board's brief before this court, which states that T-Voice representatives participated in meetings and focus groups not as representatives, but as "individual employees sharing their personal ideas with management." Resp't Br. 17, 32. But if an employee making a proposal while representing a group of other employees is sufficient to constitute a "group proposal," then there might be a substantial-evidence problem given that the members of T-Voice were titled "representatives" and told to gather input from other employees at their call centers prior to their participation in meetings. Perhaps more is required, such as a formal vote adopting the proposal as one of the "group." That, however, could be difficult to reconcile with the Board's statement that a labor organization can "lack[] a formal structure" and have no "constitution or bylaws."

*Electromation*, 309 N.L.R.B. at 994. Further, such a rule might be easily circumvented and undermine the function of Section 8(a)(2), to prohibit "employer interference in setting up or running employee 'representation' groups" that "actually rob[] employees of the freedom to choose their own representatives." *Id.* at 993.

Perhaps the Board means to cut a more fact-intensive course between these extremes. Determining whether a group is a labor organization is generally the type of Board finding to which the court will defer "in light of the Board's claim to expertise in the area of labor relations." *Napleton 1050, Inc. v. NLRB*, 976 F.3d 30, 39 (D.C. Cir. 2020) (quoting *Constellium Rolled Prods. Ravenswood, LLC v. NLRB*, 945 F.3d 546, 550 (D.C. Cir. 2019)); *accord NLRB v. Peninsula Gen. Hosp. Med. Ctr.*, 36 F.3d 1262, 1269 (4th Cir. 1994). At this point, however, the Board needs to identify what standard the Board has adopted for separating "group proposals" from proposals of employee representatives, like T-Voice representatives. Accordingly, the court remands this matter to the Board for further proceedings concerning the alleged Section 8(a)(2) violation.