# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 7, 2023        Decided January 12, 2024

No. 22-1310

T-MOBILE USA, INC.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

COMMUNICATIONS WORKERS OF AMERICA, AFL-CIO,
INTERVENOR

———

Consolidated with 23-1002

———

On Petition for Review and Cross-Application
for Enforcement of an Order
of the National Labor Relations Board

———

*Mark D. Harris* argued the cause for petitioner. With him on the briefs were *Mark Theodore* and *Shiloh Rainwater.*

*Greg P. Lauro*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Ruth E. Burdick*, Deputy Associate General Counsel, *David*

*Habenstreit*, Assistant General Counsel, and *Kira Dellinger Vol*, Supervisory Attorney.

*Glenda L. Pittman* and *John Alexander van Schiack* were on the brief for intervenor Communications Workers of America, AFL-CIO in support of respondent.

Before: SRINIVASAN, *Chief Judge*, GARCIA, *Circuit Judge*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GARCIA.

Dissenting opinion filed by *Senior Circuit Judge* RANDOLPH.

GARCIA, *Circuit Judge*: The National Labor Relations Act protects employees' rights to self-organize and choose representatives to bargain with their employer. To that end, the Act prohibits employers from dominating a "labor organization," which the Act defines as an employee group that exists at least "in part" to deal with employers over working conditions. 29 U.S.C. §§ 152(5), 158(a)(2).

In 2015, T-Mobile established an organization it called T-Voice. The company picked employees—which it labeled "representatives"—to comprise the group and told other employees to use those T-Voice representatives to raise issues with management. When the National Labor Relations Board's General Counsel charged T-Mobile with unlawfully dominating T-Voice, T-Mobile argued that T-Voice was not a labor organization because T-Voice representatives made proposals to management individually, not as a group, and that in any event most T-Voice proposals did not concern employee working conditions. Because the Board reasonably rejected those arguments as inconsistent with the Act and Board

precedent, we deny T-Mobile's petition for review and grant the Board's cross-application for enforcement of its order.

## I.

## A.

T-Mobile is a national wireless telecommunications carrier that operates 17 call centers across the country. At each center, T-Mobile employs customer service representatives—referred to as "CSRs" or "frontline" employees—to handle customer calls.

T-Mobile established T-Voice in January 2015. The organization's charter stated that its mission was to "[e]nhance Customers['] and Frontline experience by identifying, discussing, and communicating solutions for roadblocks for internal and external customers" and to "[p]rovide a vehicle for Frontline feedback and create a closed loop communication with [the] T-Mobile [Senior] Leadership Team." A761.

In June 2015, when T-Mobile expanded T-Voice to cover all call centers nationally, an Executive Vice President at the company emailed the following to all CSRs:

> T-Voice is your voice—it's made up of Frontline Representatives from each call center . . . . Their job is to raise Frontline and customer pain points to ensure they are resolved and then results are communicated back to the Frontline . . . . You can raise issues by reaching out to your T-Voice representatives. Be vocal, let us know what you think.

A676. "Pain points" are perceived problems and complaints. Customer pain points indirectly affect CSRs because they result in service calls and customer irritation that CSRs are

tasked with handling. Frontline pain points more directly concern terms and conditions of employment such as bonus compensation and work schedules.

T-Mobile filled T-Voice with CSRs selected from different shifts, call functions, and call centers and paid them to serve as T-Voice representatives. As indicated in the email above, T-Voice representatives primarily collected customer and frontline pain points from fellow CSRs and presented them to management.

T-Voice representatives collected pain points in several ways. During "table days," they set up a table and talked to CSRs face-to-face. Representatives also arranged meetings with small teams of CSRs at which they solicited pain points. And CSRs could submit pain points via physical suggestion boxes or to designated email addresses.

After they received pain points, T-Voice representatives entered them into a database as conveyed by the submitter, subject to minor grammatical or clarifying edits. T-Voice representatives also submitted their own pain points. Once the pain points were in the database, customer experience managers evaluated them and entered a response, which the T-Voice representatives then relayed back to the affected CSRs.

T-Voice representatives also discussed pain points with management in a variety of other ways. Sometimes, T-Voice representatives emailed pain points directly to management. Managers in charge of the T-Voice program also met with T-Voice representatives during weekly, monthly, and annual meetings. Weekly local meetings involved discussions with site senior managers regarding the most significant or recurring pain points. Monthly regional meetings involved sharing best practices for gathering pain points.

During monthly national telephonic meetings, T-Voice representatives learned the resolution of the previous month's top three pain points and could ask questions or make suggestions. For example, during the September 2015 meeting, a T-Voice representative suggested that the company provide CSRs with a script explaining how phone exchanges work. T-Mobile responded that it "will be" considering the proposal and added it "to the list of things to relook at to ensure [the company has] it properly covered." A746. During the January 2016 meeting, after receiving an update on T-Mobile's new device insurance plans, T-Voice representatives suggested edits to the corresponding CSR training materials. T-Mobile edited the materials accordingly. And during the March 2016 meeting, T-Voice representatives suggested that device emulators be provided to CSRs to help them troubleshoot problems with customers' devices. The company promised to provide an update on the proposal by the next month's call.

These national meetings often included focus groups run by a T-Mobile manager. During a January 2016 focus group on coverage and network issues, T-Voice representatives recommended on-site trainings for CSRs on coverage and device compatibility, and "network-specific talking points to help address customer questions/concerns." A736. The manager emailed notes from that meeting to the broader T-Voice team and the company's Customer Service Leadership Team.

T-Mobile also held two national, in-person T-Voice summits. All T-Voice representatives and many senior managers attended these two-day events. The 2015 summit included break-out sessions where focus groups of T-Voice representatives addressed topics including "Employee Engagement/T-Mobile Culture," "Metrics," "Systems/Tools," and "Frontline Readiness." Notes from the "Metrics" focus

group indicate that T-Voice representatives made proposals for changes to calculations of CSR performance metrics—for instance, dropping the high and low scores on customer-satisfaction surveys and excluding calls lasting less than 45 seconds from the calculation of another metric. The T-Mobile Vice President who hosted the focus group and another senior manager circulated the minutes to other managers "[f]or our discussion." A697.

Notably, T-Mobile sometimes announced to employees that it had implemented proposals solicited through T-Voice and credited T-Voice with those changes. In one illustrative episode, a T-Voice representative emailed a Senior Vice President to request 45 dual monitors for CSRs in a particular department. T-Mobile considered and granted the request. The company then credited the change to T-Voice, announcing in its newsletter that the "T-Voice team was instrumental in raising the need for dual monitors" and that "[s]olving this pain point should lead to a happier, more productive workplace." A116, A683. T-Mobile also credited T-Voice with changes involving, for example, an employee loyalty program that gave CSRs milestone anniversary gifts, a charging station in the employee break room, and free Wi-Fi access.

**B.**

The Communications Workers of America ("CWA") has attempted to organize CSRs at T-Mobile since 2009. In February 2016, CWA filed an unfair labor practice charge against the company. The Board's General Counsel then filed a complaint alleging, in relevant part, that T-Voice was a labor organization under Section 2(5) of the Act and that T-Mobile dominated T-Voice in violation of Section 8(a)(2) of the Act. T-Mobile has never disputed that it dominated T-Voice. The

only relevant dispute before the Board was whether T-Voice qualified as a statutory labor organization.

An Administrative Law Judge ("ALJ") held a four-day trial and ruled that T-Voice was a labor organization. On September 30, 2019, the Board reversed the ALJ. *T-Mobile USA, Inc. & CWA, AFL-CIO* ("*T-Mobile I*"), 368 N.L.R.B. No. 81 (Sept. 30, 2019). The Board read its precedent to require that a labor organization deal with management through "group proposals," and held that T-Voice did not satisfy that requirement because T-Voice representatives submitted their proposals individually rather than through a collective mechanism. *Id.* at 8–9. CWA then petitioned our court for review of the Board's decision.

On April 16, 2021, we granted CWA's petition for review and remanded the case to the Board for further consideration. *CWA v. NLRB*, 994 F.3d 653, 664 (D.C. Cir. 2021). Our decision focused on "dueling lines of Board precedent" about the "definitional requirement that a 'labor organization' must exist for the purpose, at least in part, of 'dealing with' the employer concerning conditions of work." *Id.* at 659. We noted that the Board's decision was premised on the "view that an organization does not engage in 'dealing with' an employer unless it makes 'group proposals' to the employer" and that "proposals from individual members of the group would not be sufficient." *Id.* at 660.

We agreed that the precedents the Board cited are consistent with an interpretation of the "group proposals" requirement that would "require some process for adopting or advancing [proposals] as proposals of the organization." *See id.* at 662–63 (discussing *Polaroid Corp.*, 329 N.L.R.B. 424, 429 (1999); *EFCO Corp.*, 327 N.L.R.B. 372 (1998), *enforced*, 215 F.3d 1318 (4th Cir. 2000); *E.I. du Pont & Co.*, 311

N.L.R.B. 893 (1993); *Electromation, Inc.*, 309 N.L.R.B. 990, 994 (1992), *enforced*, 35 F.3d 1148 (7th Cir. 1994)). But we also identified two other decisions the Board failed to consider: *Dillon Stores*, 319 N.L.R.B. 1245 (1995) and *Reno Hilton Resorts Corp.*, 319 N.L.R.B. 1154 (1995). *CWA*, 994 F.3d at 662. In both cases, we explained, the Board found employee groups were labor organizations without examining whether proposals from members of the group had been "embraced by the group through any formal process." *Id.* at 663. In *Dillon Stores*, the "dealing with" requirement was met even though proposals were "'advanced collectively'" only in the sense "that the proposals were made 'on a representational basis'" by members of the employee group at issue. *Id.* at 662 (quoting *Dillon Stores*, 319 N.L.R.B. at 1250, 1252). Similarly, we observed that in *Reno Hilton* the Board found labor-organization status where the employee groups "*or their members* made proposals." *Id.* (quoting *Reno Hilton*, 319 N.L.R.B. at 1156).

We further noted that, even in cases fitting the Board's new "group proposals" requirement, the Board had never "held that an organization in which employee representatives make proposals to management does not constitute a labor organization unless those proposals are adopted by the group." *Id.* at 663. Such a requirement, we explained, would seem "in tension" not only with *Dillon Stores* and *Reno Hilton*, but also with precedent holding that a group "'may meet the statutory definition of "labor organization" even if it lacks a formal structure.'" *Id.* (quoting *Electromation*, 309 N.L.R.B. at 994). Separately, we noted that such a requirement "might be easily circumvented and undermine the function of Section 8(a)(2)," which aims to broadly preclude employer domination of employee groups purporting to represent other employees. *Id.*

We therefore concluded that the Board's formal "group proposals" requirement "broke new ground" and left uncertainty "about what the record must show for the Board to find that an organization made group proposals" and qualifies as a statutory labor organization. *Id.* We remanded the case to the Board to "reconcile" its precedent, *id.* at 655, directing it to "identify what standard [it] has adopted for separating 'group proposals' from proposals of employee representatives, like T-Voice representatives." *Id.* at 664. In doing so, we noted that the Board's precedent suggested two potential rules. First, consistent with *Dillon Stores*, it might suffice that "an employee representative makes a proposal while acting in a representative capacity." *Id.* at 663; *see id.* at 661–62. Second, despite the possible difficulties we identified with such an approach, we noted that perhaps the Board meant to require something more, "such as a formal vote adopting the proposal." *Id.* at 663.

On remand, the Board effectively endorsed the first option, finding that the "group proposals" requirement for dealing is satisfied if individual group members acting in a representative capacity make proposals to management. *T-Mobile USA, Inc. & CWA, AFL-CIO* ("*T-Mobile II*"), 372 N.L.R.B. No. 4, 4–5 (Nov. 18, 2022). Applying that rule, the Board determined that T-Voice was indeed a labor organization and that T-Mobile violated Section 8(a)(2) by dominating T-Voice. *Id*. at 8–9. As part of its remedy, the Board ordered T-Mobile to immediately disestablish T-Voice and post a remedial notice at facilities where T-Voice is or has been maintained. *Id.* at 9–10.

T-Mobile timely petitioned for review and the Board filed a cross-application for enforcement of its decision.

## II.

Section 8(a)(2) of the Act makes it an unfair labor practice for an employer "to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it." 29 U.S.C. § 158(a)(2). Section 2(5) of the Act defines a "labor organization" as "any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." *Id.* § 152(5). A group therefore qualifies as a labor organization if employees participate; the group exists, at least in part, for the purpose of "dealing with" the employer; and those dealings concern the subjects listed in Section 2(5). *See Electromation,* 309 N.L.R.B. at 995–96. If an "employee representation committee or plan" is involved, there must also be evidence that the committee "is in some way representing the employees." *Id.* at 996.

The Board has held that the statutory phrase "dealing with" contemplates "a pattern or practice," *E.I. du Pont*, 311 N.L.R.B. at 894, of bilateral conduct involving "proposals from the employee [group] concerning the subjects listed in Sec[tion] 2(5), coupled with real or apparent consideration of those proposals by management," *Electromation*, 309 N.L.R.B. at 995 n.21.

## III.

T-Mobile contests four aspects of the Board's decision in *T-Mobile II*. The company argues that the Board's revised approach to the "group proposals" requirement is unreasonable and inconsistent with Board precedent; that, even under that revised approach, substantial evidence does not support the

Board's determination that T-Voice is a labor organization; that the Board deviated from its findings in *T-Mobile I* without explanation; and that the Board failed to consider key facts before ordering the disestablishment remedy. None of these arguments warrants relief.

**A.**

We first address T-Mobile's challenge to the Board's clarification of its "group proposals" requirement. We will "abide [the Board's] interpretation of the Act if it is reasonable and consistent with controlling precedent." *Enter. Leasing Co. v. NLRB*, 831 F.3d 534, 543 (D.C. Cir. 2016) (alteration in original) (internal quotation marks omitted) (quoting *Brockton Hosp. v. NLRB*, 294 F.3d 100, 103 (D.C. Cir. 2002)).

T-Mobile's argument concerns the Board's interpretation of what it means for a group of representative employees to "deal with" an employer. The Board initially held that proposals from individual members of such a group to management are not sufficient to constitute "dealing" by the group. After we raised questions about that approach and remanded to the Board for clarification, the Board changed course. In the decision on review, the Board held that an employee group can "deal with" an employer where the group's individual members make proposals to management while acting in a representative capacity, even if there is no additional indication that the full group endorses the individual member's proposal. That conclusion fits comfortably with the Act's text and purpose, and with relevant Board precedent.

As the Board explained, "nothing in the text of Section 2(5) or its legislative history supports the notion that the employee group must adopt proposals in any particular way before those proposals may be found to be group proposals." *T-Mobile II*, 372 N.L.R.B. No. 4, at 6. Rather, the Act's text

places no limit on how a group may "deal with" an employer. In assessing the related question of what types of groups may constitute labor organizations, the Board has similarly noted Section 2(5)'s "broad" text and concluded that a group may qualify "even if it lacks a formal structure, has no elected officers, constitution or bylaws, does not meet regularly, and does not require the payment of initiation fees or dues." *Electromation*, 309 N.L.R.B. at 993; *see also NLRB v. Ampex Corp.*, 442 F.2d 82, 84 (7th Cir. 1971) ("The statute has been broadly construed, both with respect to absence of formal organization and the type of interchange between the parties which may be deemed 'dealing.'").

The Board's approach also tracks the Act's statement of purpose, which includes the goal of protecting workers' "full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment." 29 U.S.C. § 151. As the Board has explained, Congress defined the term "labor organization" "broadly" to achieve that goal, aiming to "rid[] collective bargaining of employer-dominated organizations" so that employees would retain "the freedom to choose their own representatives." *Electromation*, 309 N.L.R.B. at 993.

By contrast, as we noted in *CWA*, T-Mobile's proposed requirement that a group of representative employees must adopt proposals in some particular fashion before conveying them to management would seem an odd fit with the Act's broad text and purpose. *See CWA*, 994 F.3d at 663. Accordingly, the Board was justified in choosing the contrary course we ourselves identified in that opinion. If a group of employee representatives otherwise satisfies Section 2(5)'s requirements, the fact that the group operates by allowing its individual members to make proposals to management rather

than through a more formal collective mechanism does not make employer dominance of that group any less offensive to the Act's objective of ensuring that employees retain "the freedom to choose their own representatives." *Electromation*, 309 N.L.R.B. at 993. If the individuals are members of a group that represents other employees and make proposals in their capacity as members of that group, those proposals can reasonably be regarded as proposals of the group for purposes of the "dealing with" requirement.

As for precedent, the Board recognized that it had previously found statutory dealing regardless of whether the employee group formally adopted the proposals group members submitted to management. In particular, the Board explained—consistent with our analysis in *CWA*—that its decision in *Dillon Stores* directly supports its revised approach. *T-Mobile II*, 374 N.L.R.B. No. 4, at 6. There, members of an employee group acted in a representative capacity when presenting proposals to management during quarterly meetings. *Dillon Stores*, 319 N.L.R.B. at 1250. But the group did not collectively adopt the proposals beforehand. *Id.* at 1250–51. Still, the Board found statutory dealing because the "proposals and grievances had been advanced collectively, *on a representational basis*." *Id.* at 1252 (emphasis added). As we explained in *CWA*, the phrase "advanced collectively" in *Dillon Stores* necessarily "means only that the proposals were made 'on a representational basis,'" because there was no evidence that the group adopted individual representatives'

proposals. 994 F.3d at 662.[1] As the Board also emphasized, there is no contrary precedent. That is, neither the Board nor T-Mobile has identified *any* case in which the Board "found that an employee group that acted in a representative capacity and made proposals to management was not 'dealing with' the employer" and therefore was not a labor organization. *T-Mobile II*, 374 N.L.R.B. No. 4, at 6; *see also CWA*, 994 F.3d at 663.

T-Mobile's counterarguments lack merit. The company notably does not contend that the Act's text or purpose supports its preferred requirement that the employee group take some formal action to endorse individual group members' proposals before group dealing can be found.

Instead, T-Mobile submits that the Board's approach conflicts with its precedent. T-Mobile describes several Board precedents as involving groups that not only conveyed proposals to management as representatives of other employees but also took some additional action to adopt the proposals as their own. T-Mobile Br. at 23–24 (discussing *Grouse Mt. Assocs. II*, 333 N.L.R.B. 1322 (2001), *enforced*, 56 F. App'x 811 (9th Cir. 2003); *Aero Detroit, Inc.*, 321 N.L.R.B. 1101 (1996), *aff'd in part and rev'd in part*, 144 F.3d 995 (6th Cir. 1998); and *Ryder Dist. Res., Inc.*, 311 N.L.R.B. 818 (1993)). T-Mobile's description of those cases is accurate. But that fact is no stand-in for what T-Mobile really needs: a Board decision stating that such action is *required* for a group of

---

[1] The Board explained that *Reno Hilton*, the other case we identified in *CWA*, had found groups to be labor organizations when the groups "or their members" made proposals to management. *T-Mobile II*, 372 N.L.R.B. No. 4, at 7 n.15. But the Board also observed that there was no explicit finding in *Reno Hilton* that the group acted in a representative capacity, and so it relied primarily on *Dillon Stores*. *Id.*

representative employees to qualify as a statutory labor organization.  As we have explained, there is no such case.

T-Mobile also argues that if an individual group member's proposal made in a representative capacity can constitute a "group proposal," then the Board's approach improperly conflates two distinct Section 2(5) prerequisites: the "dealing with" requirement and the requirement that, "if an 'employee representation committee or plan' is involved," there must be evidence that the committee or plan is in some way representing the employees, *Electromation*, 309 N.L.R.B. at 996.  T-Mobile is incorrect.  Although a group's representative nature might matter for multiple Section 2(5) requirements, that does not somehow render the "dealing with" requirement a nullity.   As T-Mobile acknowledges, statutory dealing requires more than a group or its members making proposals in a representative capacity—the group must also engage in a "pattern or practice" of bilateral conduct involving proposals on "the subjects listed in Sec[tion] 2(5) coupled with real or apparent consideration of those proposals by management." *Id.* at 995 n.21.

Moreover, T-Mobile has no persuasive answer to *Dillon Stores*, which we already identified in *CWA* as affirmatively in conflict with any formal group-adoption requirement. T-Mobile instead submits that later Board precedents citing *Dillon Stores* have failed to follow its reasoning.  The only case the company cites in support of that assertion is *Simmons Industries, Inc.*, 321 N.L.R.B. 228 (1996).  There, after finding that the employee committees at issue functioned in a representative capacity, the Board proceeded to conduct a separate inquiry into dealing and found the requirement satisfied because the committees made proposals to management by a "consensus process" or otherwise "discussed and made proposals." *Id.* at 254; *see id.* at 253.  According to

T-Mobile, the Board's approach in *Simmons* indicates that, even post-*Dillon Stores*, an individual member's proposal is not "imputed to the group simply because of its representative structure." T-Mobile Br. at 26. But like the other Board precedents on which T-Mobile relies, *Simmons* merely demonstrates that collective group action is *one way* of satisfying the "group proposals" requirement for statutory dealing. The decision does not state that such collective action is *necessary*, much less overturn *Dillon Stores*. Nor does it foreclose the view—which the Board has now explicitly adopted—that group members making proposals in a representative capacity is an alternative means to the same end.

**B.**

Next, we address T-Mobile's challenge to the Board's finding that T-Voice is a labor organization under the Board's clarified approach to the "group proposals" requirement.

"We must uphold the judgment of the Board unless, upon reviewing the record as a whole, we conclude that the Board's findings are not supported by substantial evidence, or that the Board acted arbitrarily or otherwise erred in applying established law to the facts of the case." *Int'l Union of Electronic, Elec., Salaried, Mach. & Furniture Workers v. NLRB*, 41 F.3d 1532, 1536 (D.C. Cir. 1994) (internal quotations and citation omitted). Substantial evidence is enough "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Micro Pac. Dev. Inc. v. NLRB*, 178 F.3d 1325, 1329 (D.C. Cir. 1999) (internal quotation mark omitted) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Thus, we reverse the Board "only when the record is so compelling that no reasonable factfinder" could agree with the Board. *Bally's Park Place, Inc. v. NLRB*, 646 F.3d 929, 935 (D.C. Cir. 2011) (internal quotation mark

omitted) (quoting *United Steelworkers of Am. v. NLRB*, 983 F.2d 240, 244 (D.C. Cir. 1993)).

Recall that, to find labor-organization status, the Board needed to find that (1) T-Voice submitted group proposals (2) on statutory subjects, (3) those proposals received real or apparent management consideration, and (4) there was a pattern or practice of such bilateral dealing. *See E.I. du Pont*, 311 N.L.R.B. at 894; *Electromation*, 309 N.L.R.B. at 995 n.21. Substantial evidence supports the Board's finding on each requirement.

The Board cited six characteristic examples of statutory dealing in support of its conclusion that T-Voice is a labor organization. *T-Mobile II*, 374 N.L.R.B. No. 4, at 7–8. They are: a September 2015 proposal regarding 45 dual monitors for CSRs in the Dedicated Care Department; October 2015 proposals concerning the metrics used to measure CSR performance; a March 2016 proposal for device emulators to help CSRs troubleshoot problems with customers' devices; a September 2015 proposal that T-Mobile provide CSRs with a script to aid in explaining phone exchanges to customers; January 2016 proposals for trainings on coverage and device compatibility, and network-specific talking points to help CSRs address customer questions; and a January 2016 proposal on updating the language in materials for training CSRs on the company's new device insurance plans. *Id.*

*First*, because the foregoing proposals "originated with [a] T-Voice representative acting as a representative of fellow employees," the Board found that they all qualify as "group proposals" under its clarified approach. *Id.* at 7. T-Mobile does not dispute the Board's finding that T-Voice members acted in a representative capacity. Nor could it. As the Board highlighted, the company calls employees serving in the

T-Voice program "T-Voice representatives," an apt title given that they are selected "from different shifts, call functions, and call centers." *Id.* at 5. Moreover, T-Voice "expressly solicited 'employee' or 'Frontline' pain points" from CSRs outside the group. *Id.* at 8. In T-Mobile's own words, T-Voice was "a direct line of Frontline feedback for senior leadership." *Id.* at 5. Taken together, this evidence establishes that T-Voice and its representatives functioned in a representative capacity. And because T-Voice representatives acted in that capacity when making the six proposals the Board identified, those six proposals were group proposals.

*Second*, the Board reasonably found that the proposals addressed statutory subjects. As the Board explained, because the proposals "concerned metrics, training, and equipment for CSRs, they constituted proposals regarding conditions of work." *Id.* at 8; *see Reno Hilton*, 319 N.L.R.B. at 1156–57 (describing "equipment needed by employees" and "training of new employees" as "employment conditions"); *T-Mobile I*, 368 N.L.R.B. No. 81, at 2 (acknowledging that "metrics" for measuring CSR performance "related to employees' terms and conditions of employment").

T-Mobile offers no contrary authority. Instead, it contends that several of the proposals were intended to address customer issues as opposed to conditions of work. But in this specific context—where T-Mobile employs CSRs for the purpose of addressing customer issues—the distinction is hardly a clean one. As we explained in *CWA*, "[c]ustomer pain points indirectly affect CSRs because they generate service calls and customer irritation that the CSRs are responsible for handling." 994 F.3d at 656. It makes sense, then, that proposals about CSRs' ability to address customer pain points also relate to their conditions of work, particularly when CSRs' performance in resolving those pain points directly impacts other terms of

their employment, such as compensation and work schedules. *See T-Mobile II*, 372 N.L.R.B. No. 4, at 2; A711. Take, for example, the March 2016 device-emulator proposal. T-Mobile insists that the proposal concerned customers' experience, not CSR working conditions. But requesting a device that would aid CSRs in performing their jobs—and, in turn, potentially improve their performance metrics—plainly concerns working conditions in addition to improving the customer experience.

*Third*, substantial evidence supports the Board's determination that T-Mobile management gave real or apparent consideration to each of the six proposals. *See T-Mobile II*, 372 N.L.R.B. No. 4, at 7–8. In response to the dual-monitors proposal, T-Mobile "reviewed the costs of the monitors and then accepted [the] proposal by supplying dual monitors to CSRs in the Dedicated Care Department." *Id.* at 7. The proposals regarding CSR metrics, trainings on coverage and device compatibility, and network-specific talking points were forwarded from senior management to other managers for discussion. *Id.* Indeed, T-Mobile eventually rejected one of the metrics proposals (dropping the high and low scores on customer-satisfaction surveys) via its response to a subsequent pain-point submission. As for the device-emulator proposal, T-Mobile "promised to provide an update" during the next T-Voice monthly meeting. *Id.* at 7–8. And after receiving the proposal for a script on phone exchanges, management added the suggestion to "the list of things to relook at to ensure [the company] ha[s] it properly covered." A746; *see T-Mobile II*, 372 N.L.R.B. No. 4, at 8. Finally, in response to the proposal to update the training material language on device insurance plans, T-Mobile "edited the language accordingly." *T-Mobile II*, 372 N.L.R.B. No. 4, at 8.

T-Mobile's objections to these findings lack merit. As a threshold matter, the company takes issue with the Board's

view that management consideration of proposals is enough to satisfy the bilateral mechanism for dealing. Citing *E.I. du Pont*, T-Mobile argues that dealing requires an employer's acceptance or rejection of a proposal by word or deed. But as the Board notes in its decision, *see T-Mobile II*, 372 N.L.R.B. No. 4, at 5, *E.I. du Pont* states only that a bilateral mechanism "*ordinarily* entails . . . acceptance or rejection by word or deed," 311 N.L.R.B. at 894 (emphasis added). Such a response is not a prerequisite for dealing under Board precedent, and none of the authorities T-Mobile cites declares otherwise. *See EFCO Corp. v. NLRB*, 2000 WL 632468, at *5 (4th Cir. May 17, 2000) (per curiam); *Simmons*, 321 N.L.R.B. at 254; *Grouse Mt. Assocs. II*, 333 N.L.R.B. 1322, 1336 (2001); *Reno Hilton*, 319 N.L.R.B. at 1156; *Dillon Stores*, 319 N.L.R.B. at 1250. Real or apparent consideration of proposals by management is a reasonable bar for bilateralism and has support in Board precedent. *See, e.g.*, *Electromation*, 309 N.L.R.B. at 995 n.21; *Polaroid*, 329 N.L.R.B. at 424–25.

T-Mobile next contends that, in any event, as to some of the six proposals, management exhibited "mere awareness" rather than real or apparent consideration. T-Mobile Reply at 17. We disagree. As the Board found, the record reflects that T-Mobile "either forwarded the[] proposals to other managers for their consideration, indicated that they would be considered, or simply accepted them." *T-Mobile II*, 372 N.L.R.B. No. 4, at 8. All of that conduct goes beyond exhibiting awareness.

T-Mobile is correct that forwarding proposals for management follow-up or promising future review is not the same as direct evidence that management actually considered the proposals. But circumstantial evidence of consideration—real or apparent—is enough for the Board to reasonably draw the required inference. *See, e.g.*, *Inova Health Sys. v. NLRB*,

795 F.3d 68, 82 (D.C. Cir. 2015) ("Thus, circumstantial, but substantial, evidence supports the Board's finding . . . ."). The record here contains at least such evidence for each of the six proposals.

*Fourth*, substantial evidence supports the Board's conclusion that the six proposals satisfy the pattern-or-practice requirement for dealing. An employee group is a labor organization under Section 2(5) if it exists even "in part" for the purpose of dealing with employers on statutory subjects. 29 U.S.C. § 152(5). So "if the evidence establishes . . . a pattern or practice [of statutory dealing] or that the group exists for a purpose of following such a pattern or practice, the element of dealing is present." *E.I. du Pont*, 311 N.L.R.B. at 894. This requirement is assessed by looking to both "what the organization is set up to do and . . . what it actually does." *Polaroid*, 329 N.L.R.B. at 424–25 (citing *Keeler Brass Co.*, 317 N.L.R.B. 1110, 1113 (1995)).

Here, as the Board emphasized, T-Mobile's own statements and actions go a long way towards satisfying that test. The T-Voice charter—written by T-Mobile—stated that the organization's mission was to "[e]nhance Customer[] and Frontline . . . experience by identifying, discussing, and communicating solutions for roadblocks for internal and external customers," and that its purpose was to "[p]rovide a vehicle for Frontline feedback and create a closed loop communication with [the] T-Mobile Sr. Leadership Team." *T-Mobile II*, 372 N.L.R.B. No. 4, at 1 (alterations in original). To be clear: The terms "Frontline" and "internal customers" refer to the T-Mobile employees that T-Voice members were charged with representing. It would be difficult to imagine a more direct statement—in the organization's founding document no less—that the group exists at least in part to deal with the employer on behalf of other employees.

The Board identified subsequent communications between T-Mobile and its employees that were consistent with T-Voice's charter. When T-Mobile announced the national roll-out of T-Voice to CSRs, T-Mobile stated that T-Voice comprises "Frontline Representatives"; that their "job is to raise Frontline and customer pain points to ensure they are resolved and then results are communicated back to the Frontline"; and that CSRs should "raise issues by reaching out to [their] T-Voice representatives." *T-Mobile II*, 372 N.L.R.B. No. 4, at 1–2 (alteration in original). As the Board put it, T-Mobile "encouraged employees to raise any and all pain points to their T-Voice representatives." *Id.* at 2.

And after the company-selected T-Voice representatives began their work, the company was sure to "announce[] to employees that it had implemented suggestions solicited through T-Voice and credit[] those changes to the T-Voice 'team.'" *Id.* The starkest example stemmed from the dual-monitor proposal. After accepting that proposal, T-Mobile announced in its newsletter that the "T-Voice team was instrumental in raising the need for dual monitors" and that "[s]olving this pain point should lead to a happier, more productive workplace." A116. The Board also found that T-Mobile credited T-Voice with, "for example, an employee loyalty program that gave CSRs milestone anniversary gifts, a charging station in the employee break room, and free Wi-Fi access." *T-Mobile II*, 372 N.L.R.B. No. 4, at 2.

In short, T-Mobile explicitly described T-Voice to its employees as a representative organization for raising issues about work conditions and then repeatedly acknowledged T-Voice's success in that intended role. Against that backdrop, the Board reasonably concluded that the six examples of dealing established a pattern or practice.

T-Mobile's arguments to the contrary are unconvincing. The company stresses that the six examples constitute a very small overall percentage of the pain points submitted through T-Voice. But it cites no Board precedent engaging in this type of ratio analysis. *E.I. du Pont*, on which T-Mobile primarily relies, acknowledges the distinction between a "pattern or practice" and "isolated instances" of dealing—it does not specify a test for differentiating between the two, let alone endorse T-Mobile's approach. 311 N.L.R.B. at 894. The same is true for the other Board decisions T-Mobile cites. *See Aero Detroit, Inc.*, 321 N.L.R.B. 1101, 1113–14 (1996); *Ryder Distrib. Res.*, 311 N.L.R.B. 814, 818 (1993).

The Act's text further justifies the Board's refusal to indulge T-Mobile's approach: It covers any organization that exists "in whole *or in part*" to deal with employers on statutory subjects. 29 U.S.C. § 152(5) (emphasis added). If T-Mobile's argument prevailed, an employer could avoid the consequences of dominating a labor organization by simply adding a non-dealing element to the organization large enough to distort the ratio in its favor.

Comparing this case to the facts of *Stoody Co.*, 320 N.L.R.B. 18 (1995), T-Mobile also argues that six examples of dealing should be insufficient as an absolute matter. In that case, the Board concluded that a single instance of statutory dealing that did not coincide with the employee group's announced purpose was an "isolated error," not a pattern or practice of dealing. *Id.* at 20–21. That situation bears no resemblance to this one. As the Board explained, far from one-off dealing that could be regarded as an "error," "the T-Voice program expressly solicited 'employee' or 'Frontline' pain points over a period of roughly 6 months," and T-Mobile repeatedly and explicitly announced that the purpose of

T-Voice was in part to improve CSR working conditions. *T-Mobile II*, 372 N.L.R.B. No. 4, at 1–2, 8.

We do not foreclose the possibility that in another case, with a different record, six instances of dealing might be insufficient to support a finding that an organization engaged in a pattern or practice of dealing within the meaning of the Board's precedents. But the full record here—including T-Mobile's own repeated statements—sufficiently supports the finding that T-Voice existed at least "in part" to engage in a pattern or practice of statutory dealing.

**C.**

T-Mobile separately asserts that the Board acted arbitrarily and capriciously because it reversed without explanation its conclusion in *T-Mobile I* that none of the six examples amounted to dealing, "either because they concerned purely customer issues (troubleshooting devices, a script about phone exchanges, setting up coverage, and talking points) or they prompted no response from management (changes to employee metrics)." T-Mobile Reply at 13. This argument mischaracterizes what the Board found in *T-Mobile I*. There, the Board stated that it was "unnecessary to pass on whether the pain points transmitted by T-Voice concerned Sec. 2(5) statutory subjects." *T-Mobile I*, 368 N.L.R.B. No. 81, at 6 n.21. We recognized as much in our prior opinion: "Because the Board found T-Voice did not 'deal with' T-Mobile as required for it to be a 'labor organization,' the Board did not address whether any pain points submitted by T-Voice concerned conditions of work or other statutory subjects." *CWA*, 994 F.3d at 657–58. And as for the proposal on changes to metrics, the Board simply noted in the facts section of the decision that one manager testified that no follow-up action took place—the Board did not make a finding as to that fact. *T-Mobile I*, 368

N.L.R.B. No. 81, at 5. Because *T-Mobile I* does not contain the findings the company claims were reversed in *T-Mobile II*, there is no inconsistency between the decisions, and T-Mobile's argument that the Board neglected to explain the claimed inconsistency necessarily fails.

**D.**

Finally, T-Mobile contests the Board's order requiring the disestablishment of T-Voice. T-Mobile offers two reasons why the disestablishment remedy is improper. First, it contends that the Board failed to consider that, in February 2016, the company "expressly limited" T-Voice to addressing customer issues and "has not engaged in any alleged dealing with management since." T-Mobile Br. at 44. After that date, the argument goes, T-Voice ceased to function as a labor organization, so disestablishing T-Voice as currently constituted would not effectuate the purposes of the Act. Second, T-Mobile claims that the Board failed to account for the harm disestablishment would cause its business.

We lack jurisdiction to consider these arguments. Section 10(e) of the Act states that "[n]o objection that has not been urged before the Board . . . shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e). This provision furthers "the salutary policy . . . of affording the Board opportunity to consider on the merits questions to be urged on review of its order." *Marshall Field & Co. v. NLRB*, 318 U.S. 253, 256 (1943). The "critical question" in applying Section 10(e) is therefore "whether the Board received adequate notice of the basis for the objection." *Camelot Terrace, Inc. v. NLRB*, 824 F.3d 1085, 1090 (D.C. Cir. 2016) (quoting *Alwin Mfg. Co. v. NLRB*, 192 F.3d 133, 143 (D.C. Cir. 1999)). Although we have not required that the

ground for an objection be stated explicitly in a party's written objections filed with the Board, we have required, at a minimum, that the ground be "evident by the context in which [the objection] is raised." *Consol. Freightways v. NLRB*, 669 F.2d 790, 794 (D.C. Cir. 1981).

T-Mobile did not put the Board on notice of the specific, fact-intensive arguments it now advances on appeal. Before the Board, T-Mobile took exception to the ALJ's disestablishment remedy in only the broadest of terms, claiming the remedy had "no support in the record, statute or case law." SA90–91. Similarly vague objections have been held to satisfy Section 10(e) only when additional context provided the Board adequate notice, such as where the party's briefing to the Board or the nature of the disputed issues clarified the nature of its objection. *See, e.g.*, *NLRB v. Blake Constr., Co.*, 663 F.2d 272, 283 (D.C. Cir. 1981); *Camelot Terrace, Inc.*, 824 F.3d at 1090; *see also May Dep't Stores Co. v. NLRB*, 326 U.S. 376, 386 n.5 (1945). No such illuminating context is present here.

## IV.

For the foregoing reasons, we deny T-Mobile's petition for review and grant the Board's cross-application for enforcement.

*So ordered.*

RANDOLPH, *Senior Circuit Judge*, dissenting: I respectfully dissent for the reasons stated by Board Member Ring in his dissent. *See T-Mobile USA, Inc.*, 372 N.L.R.B. No. 4, slip op. at 10–13 (Nov. 18, 2022).