# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued January 23, 2017          Decided May 2, 2017

No. 14-1226

OAK HARBOR FREIGHT LINES, INC.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

TEAMSTERS 174 AND TEAMSTERS LOCAL NUMBERS 81, 174,
231, 252, 324, 483, 589, 690, 760, 763, 839, AND 962,
INTERVENORS

Consolidated with 14-1273, 15-1002

On Petitions for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

*Peter N. Kirsanow* argued the cause for petitioner Oak Harbor Freight Lines, Inc. With him on the briefs were *John M. Payne* and *Selena C. Smith*. *Patrick O. Peters* entered an appearance.

*Thomas A. Leahy* argued the cause and filed the briefs for petitioner Teamsters Union Local 174, et al.

*Jared D. Cantor*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Richard F. Griffin, Jr.*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Usha Dheenan*, Supervisory Attorney.

*Peter N. Kirsanow*, *John M. Payne*, and *Selena C. Smith* were on the brief for intervenor Oak Harbor Freight Lines, Inc.

*Thomas A. Leahy* was on the brief for intervenors Teamsters Local 174, et al.

Before: GARLAND, *Chief Judge*, ROGERS, *Circuit Judge*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: The National Labor Relations Act requires employers to bargain in good faith "with respect to wages, hours, and other terms and conditions of employment." 29 U.S.C. § 158(a)(5), (d). Upon the expiration of a collective bargaining agreement, the parties to that agreement have an ongoing obligation to maintain the "status quo" as to all mandatory subjects of bargaining until they reach a new agreement or an impasse. *NLRB v. Katz*, 369 U.S. 736, 743 (1962); *Laborers Health & Welfare Tr. Fund for N. Cal. v. Advanced Lightweight Concrete Co.*, 484 U.S. 539, 544 n.6 (1988); *Triple A Fire Prot., Inc.*, 315 NLRB 409, 414 (1994). Absent an impasse, unilateral action changing the status quo of a mandatory subject of bargaining violates Section 8(a)(5) of the Act as a "circumvention of the duty to negotiate." *Katz*, 369 U.S. at 743. Pension and healthcare benefits are mandatory subjects of bargaining. *See Allied Chem. & Alkali Workers of Am., Local Union No. 1 v. Pittsburgh Plate Glass Co., Chem. Div.*, 404 U.S. 157, 180 (1971). Both requirements are

implicated here.

Oak Harbor Freight Lines, Inc. and several locals of the Teamsters Union established four health benefit and pension trusts, so-called "Taft-Hartley" trusts, as part of their collective bargaining agreement. Under that agreement, Oak Harbor was required to make monthly contributions to the trusts. When the agreement expired and no new agreement was reached after a year, Union employees went on strike. When Oak Harbor ceased making contributions to the trusts, the Union filed unfair labor practice charges. The National Labor Relations Board ruled the Union had waived its right to bargain over the cancellation of contributions in subscription agreements to three of the trusts after the collective bargaining agreement expired, and Oak Harbor, having failed to prove a fourth subscription agreement existed or other basis to find a union waiver, violated Sections (8)(a)(5) and (1) of the National Labor Relations Act by ceasing to make payments to the fourth trust. The Board also ruled that Oak Harbor's unilateral imposition of its medical plan after the strike ended violated the Act. Both Oak Harbor and the Union filed petitions for review of the Board's Decision and Order. For the following reasons, we deny the petitions for review and grant the Board's cross-application to enforce its Order.

## I.

Oak Harbor is a freight transportation company operating throughout the northwestern United States. Since at least 1992, local Teamsters unions (together, "the Union") have represented Oak Harbor employees based in Washington, Oregon, and Idaho, engaging in joint bargaining for a single collective bargaining agreement. As relevant, the latest collective bargaining agreement was effective from November 1, 2004 until October 31, 2007. It required Oak Harbor to make

monthly contributions to four "Taft-Hartley" trusts for employee health benefits and pensions, 29 U.S.C. § 186(c)(5), and set the contribution rate for each trust.

Negotiations for a new collective bargaining agreement began in August 2007. More than a year later, the parties still had not reached a new agreement, and on September 22, 2008, Union employees went on strike. Oak Harbor sent letters to the Union and to the four trusts, notifying them of its intent to cease making contributions to the trusts five days after the notices were received. The letters to three trusts — Washington Teamsters Welfare Trust, the Western Conference of Teamsters Pension Trust Fund, and the Retirees Welfare Trust — referenced cancellation provisions in the trust subscription agreements or employer-union pension certifications (collectively, "subscription agreements"). The cancellation provision in the Retirees Welfare Trust's subscription agreement stated:

> Upon expiration of the current or any subsequent bargaining agreement requiring contributions, the employer agrees to continue to contribute to the trust in the same manner and amount as required in the most recent expired bargaining agreement until such time as the [employer or union] either notifies the other party in writing . . . of its intent to cancel such obligation five days after receipt of notice or enter[s] into a successor bargaining agreement.

The cancellation provisions for the other two trusts were virtually identical. With respect to the fourth trust — the Oregon Warehouseman's Trust — Oak Harbor wrote:

> We are not certain whether Oak Harbor Freight Lines has a subscription agreement with the Oregon

> Warehouseman's Trust, which contains a Notice to Cancel Provision. If such a provision exists in a Subscription Agreement signed by Oak Harbor Freight Lines, please be advised that this constitutes Notice of Intent to Cancel.

Letter from John M. Payne, Esq. (Sept. 23, 2008). Five days after receipt of the letters, Oak Harbor ceased contributions to the four trusts.

During the strike, Oak Harbor hired strike replacements, which included "crossover employees," i.e., Union members who crossed the picket line. It considered itself obligated to continue making trust payments for the crossovers during the strike. When informed the trusts would not accept contributions on behalf of only these Union members, Oak Harbor proposed that for the duration of the strike it would make pension contributions to an escrow account and "temporarily cover its crossovers" under Oak Harbor's medical plan. Mem. from John M. Payne, Esq., to Union Representatives Al Hobart, Buck Holliday, and Ken Thompson (Oct. 3, 2008). The Union agreed. Then, on February 17, 2009, five days after the Union extended an unconditional offer for its members to return to work, Oak Harbor proposed "to continue the [February 17] status quo regarding wages and benefits" for the returning strikers; that is, the interim strike arrangement would continue for all employees: pension contributions would be paid to escrow accounts and medical coverage would be provided under Oak Harbor's medical plan. The Union disagreed with Oak Harbor's understanding of its "status quo" obligation and countered with a proposal for an "interim agreement" with the trusts in order to allow trust contributions to resume during negotiations for a new collective bargaining agreement. Oak Harbor refused, and when strikers returned to work on February 26, 2009, Oak Harbor unilaterally imposed the terms in its February 17th letter.

The Union filed unfair labor practice charges with the Board in light of Oak Harbor's cessation of trust payments and unilateral imposition of its medical plan after the strike ended. An administrative law judge ("ALJ") found no unfair labor practice by Oak Harbor in ceasing to make contributions to the trusts in view of the subscription agreements, but concluded Oak Harbor's unilateral action placing Union employees under its medical plan after the strike ended violated Sections 8(a)(5) and (l) of the Act. Both parties appealed. The Board adopted the ALJ's finding and conclusions on Union waiver except with regard to Oak Harbor's cessation of payments to the Oregon Warehouseman's Trust. As to that trust, the Board found Oak Harbor had failed to prove there was a subscription agreement or present other evidence that the Union had clearly and unmistakably waived its right to bargain over the cancellation of contributions. It ordered Oak Harbor, upon the Union's request, to make all post-strike payments to the Oregon Warehouseman's Trust, restore the pre-strike status quo for health care benefits, and reimburse employees, with interest, for any expenses resulting from the failure to make the required payments to that trust. The Union and Oak Harbor petition for review of the Board's Decision and Order.

## II.

The Union challenges the Board's finding that it clearly and unmistakably waived its right to bargain over cancellation of contributions to the three trusts. It maintains that the Board inappropriately considered extrinsic evidence to the expired collective bargaining agreement when it looked to the terms of the subscription agreements, and that those agreements were only "ministerial" documents incapable of demonstration of the Union's clear and unmistakable waiver. The court will uphold the decision of the Board unless it was arbitrary or capricious or contrary to law, and as long as its findings of fact are supported

by substantial evidence in the record as a whole. *Wayneview Care Ctr. v. NLRB*, 664 F.3d 341, 348 (D.C. Cir. 2011); *Pirlott v. NLRB*, 522 F.3d 423, 432 (D.C. Cir. 2008). Substantial evidence, which is "more than a mere scintilla," is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 217 (1938); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951).

The Board properly concluded that the Union waived its statutory rights to receive and bargain over continued contributions to the Washington Teamsters Welfare Trust, the Retirees Welfare Trust, and the Western Conference of Teamsters Pension Trust Fund. Applying its own test, the Board determined that the subscription agreements for those trusts "clearly and unmistakably" authorized Oak Harbor to cease trust contributions upon expiration of the collective bargaining agreement after five days' notice. Under this court's precedent, when an "employer acts pursuant to a claim of right under the parties' agreement, the resolution of that refusal to bargain charge rests on an interpretation of the contract at issue." *NLRB v. United States Postal Ser.*, 8 F.3d 832, 837 (D.C. Cir. 1993). Although the Board has declined to adopt this view of the law, *see, e.g.*, *Enloe Medical Center v. NLRB*, 433 F.3d 834, 837–38 (D.C. Cir. 2005), this non-acquiescence issue does not matter here. No party raises the "contract coverage" issue, the Union maintains that the Board misapplied its own precedent, and the court would reach the same result regardless of which doctrine is applied. Contrary to the Union's contention that the Board erred in considering the extrinsic evidence of the subscription agreements but failing to consider *its* "extrinsic evidence" that the cancellation terms were not the product of bargaining, the Board properly concluded that considering the Union's additional evidence would not have changed its analysis or outcome.

The Union contends that the Board misapplied its own waiver precedent. In *Cauthorne Trucking*, the Board found a clear and unmistakable waiver of a union's right to bargain over contributions to trust funds after the expiration of the collective bargaining agreement where the subscription agreement stated:

> It is understood and agreed that at the expiration of any particular collective bargaining agreement by and between the Union and [the employer,] any Company's obligation under this Pension Trust Agreement shall terminate unless, in a new collective bargaining agreement, such obligation shall be continued.

256 NLRB at 722. The Union attempts to show that the subscription agreements here were "ministerial" and "therefore not indicative of a bargained-for waiver," Union Pet'r's Br. 34, relying on *Schmidt-Tiago Construction Company*, 286 NLRB 342 (1987), and *American Distributing Company*, 264 NLRB 1413 (1982). It also questions the precedential force of *Cauthorne Trucking*.

The Union maintains that the cancellation provisions for the three "Taft-Hartley" trusts are better compared to the subscription agreements in *Schmidt-Tiago* and *American Distributing* where the Board concluded the text was ambiguous. An examination of those precedents reveals no error by the Board. In *Schmidt-Tiago*, the subscription agreement stated that the employer and union "certify that a written labor agreement is in effect between the parties providing for contributions to the [Trust Fund]," and that the employer and union "agree to be bound by the [collective bargaining agreement] and the [subscription agreement] as now constituted or as hereinafter amended." 286 NLRB at 365. The Board found the agreement "does not on its face, as in *Cauthorne Trucking*, specifically state that [the employer's]

obligation to contribute to the pension trust fund ends with the expiration of the current collective-bargaining contract." *Id.* at 366. Similarly, in *American Distributing*, where the subscription agreement stated, "[t]he undersigned employer and [u]nion hereby certify that a *written* pension agreement (in most cases a Teamsters collective bargaining agreement) is in effect between the parties providing for contributions to the [Trust Fund]," the Board found no unmistakable waiver of bargaining after the expiration of the collective bargaining agreement; the Board explained that "[s]uch language [did] no more than ministerially attach to the enabling collective-bargaining agreement for verification and collection purposes." 264 NLRB at 1415. Given the plain terms of the cancellation provisions in the subscription agreements for the three trusts, there can be no serious disagreement that the Board properly concluded these cancellation provisions on their face were more like that in *Cauthorne Trucking*, 256 NLRB at 722, than in the two cases on which the Union relies.

To the extent the Union correctly points out that the Board has applied *Cauthorne Trucking* "narrowly," *The Finley Hospital*, 359 NLRB 156, 159 n.5 (2012), that is not the same as questioning its precedential value. Rather, the Board has explained that it will find a clear and unmistakable waiver of the right to bargain over the cancellation of trust payments only where there is explicit contract language authorizing an employer to cancel its obligations. *Id.* at 157–158. The three subscription agreements did just that. There is no merit to the Union's view that a ministerial subscription agreement cannot constitute a valid waiver. As the Board stated, "even assuming that the cancellation language had been dictated by the Funds and was not specifically bargained over by the parties, the signed documents establish that the Unions waived their right to bargain" over cancellation of contributions to the three trusts. Board Decision and Order, 1 n.2.

**III.**

Oak Harbor's challenges to the Board's Decision and Order are also unpersuasive.

**A.**

Regarding trust contributions, the Board, as noted, has determined that waiver of the right to bargain must be shown to be clear and unmistakable. *Provena St. Joseph Med. Ctr.*, 350 NLRB 808, 810 (2007); *see Metro. Edison Co. v. NLRB*, 460 U.S. 693, 708 (1983). Oak Harbor, as the party claiming waiver, had the burden of proof. *Good Samaritan Hosp.*, 335 NLRB 901, 918 (2001). The ALJ apparently inferred the existence of a subscription agreement for the Oregon Warehouseman's Trust based on the existence of subscription agreements for the other three trusts. But the Board's contrary finding is supported by substantial evidence in the record. There was no evidence that a fourth subscription agreement actually existed, which, absent other grounds for waiver, was necessary to find that the Union had clearly and unmistakably waived its right to bargain over the cancellation of contributions to the Oregon Warehouseman's Trust. Oak Harbor attempted to demonstrate the Union's waiver through the testimony of its attorney John Payne, but his testimony was hardly dispositive. He testified one Oregon Warehouseman's Trust employee had told him: "I believe we have a subscription agreement," and another told him she was "almost sure" there was a subscription agreement, "but I'll have to double check, but we almost always do require one." Neither was there evidence that the Oregon Warehouseman's Trust expressly denied the existence of a subscription agreement to Oak Harbor. On the other hand, Oak Harbor does not maintain that it ever received a copy of a subscription agreement from the Oregon Warehouseman's Trust or any confirmation one existed beyond the trust's general practice that agreements typically existed.

The Board reasonably concluded that, at most, there was speculation based on an asserted usual practice to have a subscription agreement that one existed for the Oregon Warehouseman's Trust, but no evidence specific to that Trust. Indeed, even the evidence of the Oregon Warehouseman's Trust's general practice was called into question; an Oregon Warehouseman's Trust administrator testified that the trust did *not* generally require a subscription agreement. Although the parties' expired collective bargaining agreement required Oak Harbor to make monthly contributions to four trusts, it did not require that there be subscription agreements with the trusts, much less that they include a cancellation provision. Oak Harbor's notice of cancellation letter to the Oregon Warehouseman's Trust confirms the speculative nature as to the evidence of the existence of a subscription agreement. Absent evidence to support a finding that a fourth subscription agreement existed, much less that it existed and contained an unequivocal cancellation provision like that in the subscription agreements for the other three trusts, Oak Harbor failed to meet its burden to show the Union had clearly and unmistakably waived its right to bargain on contributions to the Oregon Warehouseman's Trust.

Oak Harbor's other attempts to block the Union's right to bargain also fail. The Board reasonably rejected its argument that the Union was estopped from challenging the existence of a fourth subscription agreement. As Oak Harbor sees it, because the Union never informed it that there was no subscription agreement for the Oregon Warehouseman's Trust, the Union is "in no position to now benefit by [its] silence and [its] acquiescence and seek retroactive contributions." Oak Harbor Pet'r's Br. 23. But this is not affirmative evidence that the Union had informed Oak Harbor that the subscription agreement existed, and the Board precedent on which Oak Harbor relies is inapposite. In *Manitowoc Ice, Inc.*, 344 NLRB 1222, 1224

(2005), the Board found estoppel based on the union's repeated acquiescence to the employer's unilateral changes to the employer's profit-sharing plan as a management prerogative. *Id.* The union had repeatedly raised the issue of profit-sharing during negotiations, the employer had repeatedly rejected the union's proposal to guarantee profit-sharing, and the union had ultimately agreed to a collective bargaining agreement that did not address the profit-sharing plan. *Id.* at 1223. The Board concluded that there was "a clear understanding that the profit-sharing plan would remain a management prerogative, and that the Union, by its conduct . . . bargained away its interest in the plan." *Id.* at 1224 (internal quotations omitted). By contrast, no evidence exists here as would show that the Union discussed and "bargained away" its interest in maintaining contributions to the Oregon Warehouseman's Trust. Nor did the Union fail to object contemporaneously that Oak Harbor was not bargaining in good faith.

*Lehigh Portland Cement Co.*, 286 NLRB 1366, 1383 (1987), does not advance Oak Harbor's estoppel claim. There, the employer took action over the course of a year consistent with its acceptance of a merger of two unions, including dealing with the representatives of the newly-merged union. The Board found that the employer was estopped from challenging the validity of the merger a year later because "the [e]mployer knew of the merger and behaved in a way which encouraged justified reliance by the Union." *Id.* Likewise, in *Alpha Associates and Union of Needletrades*, 344 NLRB 782 (2005), the employer was estopped from challenging the validity of the union in light of the employer's "voluntary recognition of the [u]nion" and its "conduct of bargaining with the [u]nion for more than a year prior to its repudiation of the bargaining agreement," *id.* at 783.

It is true that the Union did not challenge the cancellation of contributions to the Oregon Warehouseman's Trust on the

ground there was no subscription agreement, but it did challenge Oak Harbor's cancellation of contributions to all four trusts less than a month after the strike ended when it filed unfair labor charges. There is no history of Union acquiescence or an element of surprise in the Union's position that Oak Harbor violated the Act when it ceased to make contributions to the four trusts. Oak Harbor's consistent position that it validly cancelled its contributions to the Oregon Warehouseman's Trust, in turn, presents no bar to the Union's challenges.

The Board also properly found there was no evidence that a "mutual mistake" prevented the Union from challenging the cessation of contributions to the Oregon Warehouseman's Trust. Oak Harbor's reasoning follows its estoppel argument and is equally unpersuasive. Its reliance on *Americana Healthcare Center*, 273 NLRB 1728 (1985), is misplaced. There, the Board referred to a mutual mistake only in reaching the conclusion that terms inadvertently omitted from a collective bargaining agreement could be read into the final document, and in ruling that the collective bargaining agreement's "zipper clause" therefore could not be invoked by the employer. *Id.* at 1733; *see also NLRB v. Americana Healthcare Ctr.*, 782 F.2d 941, 945 (11th Cir. 1986). The record shows no similar circumstances here.

**B.**

As to the unilateral action of imposing its medical plan on employees after the strike ended, in some cases economic exigency may justify an employer's unilateral change, but this is not one of them. Oak Harbor contends that it was merely applying the status quo in order to assure that returning employees had health benefits, and that by February 2009, the status quo had changed as a result of the parties' arrangement for crossover employees to be covered by Oak Harbor's medical plan. The record shows, however, that the agreement on

crossover employees during the strike was temporary and that Oak Harbor itself described it as an "interim measure pending the outcome of bargaining and of the strike." Mem. from John M. Payne, Esq., to Union Representatives Hobart, Holliday and Thompson (Oct. 3, 2008).

Alternatively, Oak Harbor contends that it was justified in unilaterally placing Union workers on its medical plan because the parties had reached an impasse or Oak Harbor faced an economic exigency. These defenses were properly rejected by the Board. "A bargaining impasse . . . occurs when good faith negotiations have exhausted the prospects of concluding an agreement, leading both parties to believe that they are at the end of their rope." *TruServ Corp. v. NLRB*, 254 F.3d 1105, 1114 (D.C. Cir. 2001) (internal quotations and citation omitted). Typically, the parties must have reached an impasse as to overall bargaining: "[i]mpasse over a single issue" will create an overall bargaining impasse only if that issue "is of such overriding importance that it frustrates the progress of further negotiations." *Laurel Bay Health & Rehab. Ctr.*, 353 NLRB 232, 232 (2008) (internal quotations and citations omitted).

The Board found that there was no overall impasse to negotiations in February 2009, a finding Oak Harbor does not challenge. Nor does Oak Harbor suggest that the matter of health insurance was of such "overriding importance" that its unilateral action was justified in the absence of an overall impasse. The Board also could properly reject Oak Harbor's position that an economic exigency authorized it to act unilaterally, finding that Oak Harbor failed to show that it faced an economic exigency that posed a "heavy burden" and "require[d] prompt implementation" to justify its conduct at the end of the strike. *Vincent Indus. Plastics, Inc. v. NLRB*, 209 F.3d 727, 734 (D.C. Cir. 2000).

Accordingly, we deny the petitions for review, and we grant the Board's cross-application to enforce its Order.