# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 19, 2023      Decided February 16, 2024

No. 22-1261

AMERICAN MEDICAL RESPONSE OF CONNECTICUT, INC.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

———

Consolidated with 22-1283

———

On Petition for Review and Cross-Application
for Enforcement of an Order
of the National Labor Relations Board

———

*Kaitlin Kaseta Lammers* argued the cause and filed the briefs for petitioner.

*Greg P. Lauro*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Jennifer A. Abruzzo*, General Counsel, *Ruth E. Burdick*, Deputy Associate General Counsel, *David Habenstreit*, Assistant General Counsel, and *Kira Dellinger Vol*, Supervisory

Attorney. *Milakshmi V. Rajapakse* and *Kellie J. Isbell*, Attorneys, entered appearances.

Before: MILLETT and RAO, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* RAO.

RAO, *Circuit Judge*: American Medical Response of Connecticut ("AMR") refused to fulfill information requests from its union because, it claimed, the emergency provision of its collective bargaining agreement excused it from providing that information during the COVID-19 pandemic. The National Labor Relations Board concluded AMR's refusal violated the duty to bargain under the National Labor Relations Act ("NLRA"), regardless of the collective bargaining agreement's terms. We disagree. As this Circuit has repeatedly held, abiding by the terms of a bargained-for contract is a defense to a charge that a company failed to bargain. We therefore grant AMR's petition, vacate the Board's order, and remand for the Board to consider AMR's contractual defense.

I.

A.

AMR operates ambulances and other medical transportation and employs emergency medical technicians and paramedics. In AMR's New Haven division, these employees are represented by the International Association of EMTs and Paramedics ("Union"). The Union and AMR concluded a collective bargaining agreement that covered 2019 through 2021.

The spread of COVID in March 2020 created unique challenges for AMR and its employees. Front-line medical workers faced severe health risks. Widespread social distancing and lockdowns caused demand for medical transportation to plummet. That month, AMR invoked the emergency provision of the collective bargaining agreement, § 23.03, and cut shifts to reflect reduced demand.

As the pandemic continued, conflicts arose between the Union and AMR. In early May 2020, the Union president raised three issues to AMR. First, he expressed concerns that AMR had shifted work to a non-Union division by allowing that division's ambulances to operate in New Haven.[1] Second, he relayed worker complaints that the company was holding workers past the end of their shifts due to emergency needs. Finally, he asked AMR to cut shifts based on seniority, as required by the collective bargaining agreement.

The Union and AMR discussed these concerns over the next three months. The Union also sent AMR four letters requesting information to investigate potential grievances related to these concerns. AMR responded to some of these requests. It explained seniority was not considered when cutting shifts but maintained § 23.03 and COVID exempted AMR from that requirement. The company provided lists of shifts that were cut. Addressing the request for response time policies, AMR explained such policies did not exist. But AMR refused to provide responses to five of the Union's requests,

---

[1] Similar concerns previously arose in 2019 when the Union filed a grievance alleging AMR shifted work from the New Haven division to a non-Union division under the false pretext of keeping ambulance response times short. The Union and AMR informally resolved that grievance.

which sought: (1) a list of Union members removed from the schedule; (2) New Haven call volume data; (3) data on outside crews responding in the New Haven coverage area; (4) New Haven response times; and (5) a list of Union members affected by shift cuts.

The Union escalated its concerns through the grievance process of its collective bargaining agreement before filing a charge with the Board alleging that AMR "failed/refused to provide information to the Union."

### B.

The Regional Director filed a complaint against AMR alleging the company's failure to provide information violated the statutory duty to bargain collectively. In response, AMR asserted five affirmative defenses,[2] all of which the administrative law judge ("ALJ") rejected. We address only one of those defenses, namely that the Union, through the collective bargaining agreement, "waived any rights to the requested information."

On this issue, the ALJ first stated the Board "does not pass upon the merits of the grievance or matter in dispute" when determining whether information requests are "relevant" to a grievance. He held it was, therefore, "unnecessary, in fact inappropriate … to evaluate the merits of [AMR's] contractual waiver arguments." He nonetheless gestured toward the legal standards for evaluating waiver, saying that AMR "failed to show that the Union, contractually or otherwise, clearly and unmistakably waived its right to the relevant information at

---

[2] The complaint also alleged AMR's failure to provide response time policies was a violation. The administrative law judge accepted AMR's factual defense that such policies did not exist. This issue is not contested on appeal.

issue," and that Board precedent foreclosed indirect waiver of grievance-related information requests. The ALJ concluded that AMR withheld information in violation of the NLRA's duty to bargain and ordered AMR to provide the requested information. The Board adopted the ALJ's opinion in all material respects and largely affirmed the remedy requiring AMR to provide the information.

AMR petitions for review, and the Board files a cross-application for enforcement.

## II.

"Legal standards promulgated by the Board under the NLRA must be rational and consistent with the Act, and applications of those standards in individual cases must be reasonable and reasonably explained." *Circus Circus Casinos, Inc. v. NLRB*, 961 F.3d 469, 475 (D.C. Cir. 2020) (cleaned up). "A Board decision does not rest on reasoned decisionmaking if it fails to offer a coherent explanation of agency precedent." *Commc'ns Workers of Am. v. NLRB*, 994 F.3d 653, 658 (D.C. Cir. 2021) (cleaned up). We will set aside a Board decision that is "arbitrary or capricious," "contrary to law," or not "supported by substantial evidence in the record as a whole." *Oak Harbor Freight Lines, Inc. v. NLRB*, 855 F.3d 436, 440 (D.C. Cir. 2017).

## III.

AMR raised a threshold contractual defense to the failure-to-bargain charge, namely that under § 23.03 of the collective bargaining agreement, AMR was not responsible for providing the requested information during an emergency. That section provides:

Section 23.03 – Disasters

A.    Local Disasters

> The parties agree that the Employer shall be relieved of any and all obligations hereunder relating to scheduled paid time off, job posting, shift changes and transfers, in the event of and during the term of a disaster or catastrophe such as fire, flood, explosion, power failure, earthquake, or other act outside the control of the Employer and causing disruption to the Employer's normal operations.

AMR says this provision relieves it of the obligation to provide the information both directly and indirectly. First, AMR maintains that § 23.03 directly relieves the contractual obligation to provide the requested information. Under § 16.08 of the agreement, AMR must "produce non-privileged and non-confidential information relevant to … [a] grievance." AMR argues that when information requests "relat[e] to scheduled paid time off, job posting, shift changes and transfers," § 23.03 excuses AMR from providing the information during an emergency.[3] Second, to the extent § 23.03 relieved AMR from scheduling, job posting, and shift change duties due to the COVID-19 pandemic, AMR argues

---

[3] Section 23.03's waiver of *contractual* obligations rather than *statutory* obligations has important implications for AMR's claim. Our precedent describes "two *separate*" and "analytically distinct" inquiries: first, whether a matter is "'covered by' or 'contained in' the collective bargaining agreement" and, second, whether a union has waived the statutory right to bargain over a matter. *Dep't of the Navy v. FLRA*, 962 F.2d 48, 56–57 (D.C. Cir. 1992). Because § 23.03 operates on contractual obligations, we interpret AMR's direct claim as pertaining to the first inquiry.

that it also indirectly eliminates the Union's right to request information about a potential grievance relating to those duties.

The Board determined it was "unnecessary, in fact inappropriate, … to evaluate the merits of [AMR's] contractual waiver arguments." The Board, however, must enforce collective bargaining agreements, which here required determining whether the agreement directly or indirectly excused AMR from providing the information requested by the Union. We therefore hold the Board's failure to consider AMR's contractual defense was contrary to law.

## A.

As a threshold matter, the Board was required to decide the merits of AMR's contractual defense. The NLRA establishes a duty to bargain that "has long been acknowledged to include a duty to supply a union with requested information that will enable the union to negotiate effectively and to perform properly its other duties as bargaining representative." *Oil, Chem. & Atomic Workers Loc. Union No. 6-418 v. NLRB*, 711 F.2d 348, 358 (D.C. Cir. 1983) (cleaned up); *see also* 29 U.S.C. § 158(a)(5); *Tchrs. Coll. v. NLRB*, 902 F.3d 296, 301 (D.C. Cir. 2018). Like other subjects of collective bargaining, the duty to provide information may be modified by agreement between employer and union. *Wilkes-Barre Hosp. Co. v. NLRB*, 857 F.3d 364, 376 (D.C. Cir. 2017) (explaining that a union may "exercis[e] its right to bargain about a particular subject by negotiating for a provision in a collective bargaining contract that fixes the parties' rights" (cleaned up)).

Courts and the Board "are bound to enforce lawful labor agreements as written." *NLRB v. U.S. Postal Serv.*, 8 F.3d 832, 836 (D.C. Cir. 1993); *cf. Textile Workers Union v. Lincoln Mills of Ala.*, 353 U.S. 448, 455 (1957) (explaining the "federal

policy that federal courts should enforce [collective bargaining] agreements on behalf of or against labor organizations and that industrial peace can be best obtained only in that way"). Determining parties' rights under a collective bargaining agreement is a matter of contract interpretation. *Wilkes-Barre Hosp. Co.*, 857 F.3d at 376. When a contract settles a union's rights, ordinary contract interpretation determines the scope of those rights. *See, e.g.*, *U.S. Postal Serv.*, 8 F.3d at 836; *Loc. Union No. 47, Int'l Bhd. of Elec. Workers v. NLRB*, 927 F.2d 635, 641 (D.C. Cir. 1991) (requiring the Board to give "full effect to the plain meaning of" the contract).

A provision that narrows information rights is a part of a collective bargaining agreement, the same as any other contractual term. *See Gannett Rochester Newspapers v. NLRB*, 988 F.2d 198, 199, 203 (D.C. Cir. 1993) (treating a contract provision excusing company from providing information the same as other provisions excusing the company from statutory bargaining obligations).

The Board here concluded that it was unnecessary to consider AMR's contractual defense before determining that AMR's refusal to provide information constituted a statutory failure to bargain. In addition to violating the NLRA's requirement that the Board enforce contracts, this approach breaks with longstanding Board precedent. As the Board has repeatedly recognized, it must determine whether a collective bargaining agreement relieves the employer of the duty to provide information. *See, e.g.*, *Quality Bldg. Contractors, Inc.*, 342 NLRB 429, 432 (2004) ("A union can relinquish its statutory right to information."); *see also, e.g.*, *Bos. Mut. Life Ins. Co.*, 170 NLRB 1672, 1672 (1968) (holding that a contract excusing the company from providing information was a defense to an alleged § 8(a)(5) violation); *N.Y. Tel. Co.*, 299

NLRB 351, 352–53 (1990) (rejecting, on the merits, the employer's argument that the contract excused it from providing information).

Rather than address AMR's contractual defense as such, the Board incorrectly framed the argument as one about the "relevance" of the information. When determining whether information is relevant to a grievance, the Board applies a "discovery-type standard" and does not address the merits of the underlying grievance. *Tchrs. Coll.*, 902 F.3d at 302; *NLRB v. Acme Indus. Co.*, 385 U.S. 432, 437 (1967); *Shoppers Food Warehouse Corp.*, 315 NLRB 258, 259 (1994). Separate from any question of relevance, however, AMR specifically argued that it had no contractual duty to provide the information at all. The question of whether the Union has a right to relevant information is antecedent to and distinct from whether the information is relevant. If § 23.03 relieves AMR of its discovery obligations during an emergency, then the relevance of the information is not at issue.

Following the NLRA and established precedent, the Board was first required to consider whether § 23.03 of the collective bargaining agreement relieved AMR from the obligation to provide information, either directly or indirectly. In doing so, the Board must apply ordinary contract interpretation principles. Instead, it erred by putting the cart before the horse, concluding AMR failed to provide information before determining whether AMR had a contractual duty to provide such information.

## B.

After declining to consider the contractual defense, the Board nonetheless articulated legal standards related to AMR's

direct and indirect arguments. But the Board's discussion does not cure its failure to address AMR's § 23.03 arguments.

To the extent the Board explained that the collective bargaining agreement here did not include a "clear and unmistakable" *waiver* of information rights, it misconstrued AMR's argument. Whether an employer has an ongoing duty to bargain during the term of an existing collective bargaining agreement "depends upon two *separate* inquiries: whether the matter about which the union seeks to negotiate is 'covered by' or 'contained in' the collective bargaining agreement; and, if not, whether the union has somehow relinquished its right to bargain." *Dep't of the Navy v. FLRA*, 962 F.2d 48, 56 (D.C. Cir. 1992). As we have long held, when a "matter is covered by the collective bargaining agreement, the union *has exercised* its bargaining right and the question of waiver is irrelevant." *U.S. Postal Serv.*, 8 F.3d at 836 (cleaned up); *see Heartland Plymouth Ct. MI, LLC v. NLRB*, 838 F.3d 16, 19 & n.1 (D.C. Cir. 2016). The "clear and unmistakable" standard is not a decision on the merits of the first inquiry, *i.e.*, whether the contract covers the matter; it is "relevant only to the *second* inquiry." *Dep't of the Navy*, 962 F.2d at 56.

The Board has now adopted this circuit's "contract coverage" approach. *MV Transp., Inc.*, 368 NLRB No. 66, at *1–21 (2019). When information rights, no less than other matters subject to collective bargaining, are set in an agreement, the scope of those rights turns on the meaning of the agreement, determined through the ordinary rules of contract interpretation. A Board ruling on the second inquiry, whether there has been a non-contractual waiver, would not cure a failure to decide the first inquiry, whether the contract covered the matter.

Furthermore, to the extent the Board's discussion of *ADT, LLC*, 369 NLRB No. 31, at *1 & n.2 (2020), *vacated on other grounds*, 9 F.4th 63 (2d Cir. 2021), and *Stericycle, Inc.*, 370 NLRB No. 89, at *1 n.5 (2021), reflects a decision on the merits of AMR's indirect argument, the Board failed to explain its decision and how it comports with precedent. *See Commc'ns Workers*, 994 F.3d at 658.

AMR's argument, that § 23.03 indirectly relieves it of the obligation to provide information, relies on both contract and statutory interpretation. The employer's statutory duty to provide information is derivative of the duty to bargain. *Oil, Chem. & Atomic Workers*, 711 F.2d at 358. The employer must "supply the union with requested information that will enable it to negotiate effectively and to perform properly its other duties as bargaining representative." *Loc. 13, Detroit Newspaper Printing & Graphic Commc'ns Union v. NLRB*, 598 F.2d 267, 271 (D.C. Cir. 1979). For this reason, the Board has previously held that a collective bargaining agreement eliminating the duty to bargain over a particular issue can indirectly eliminate the duty to provide the union information to bargain over that issue. *ADT, LLC*, 369 NLRB No. 31, at *1.

The issue here differs slightly: whether a contract eliminating an employer's duty under a collective bargaining agreement indirectly eliminates the company's obligation to provide information about a potential grievance relating to the eliminated duty. The Board asserted that a contract excusing a company from its underlying obligation does not, under the NLRA, excuse the company from providing information about related grievances. The Board relied on *Stericycle, Inc.*, 370 NLRB No. 89 (2021), for this categorical rule, but that case does not address the situation in this case. In *Stericycle*, an employer failed to correctly deduct employees' healthcare contributions for four months. *Id.* at *17. The employer then

unilaterally implemented a plan to deduct the shortfall from future paychecks. While the contract excused the company from bargaining over this remedial plan, the union still had a potential grievance based on the employer's incorrect deductions. *Id.* at \*1 n.5. The contract excused the company from one duty, but the grievance was based on a different duty. *Stericycle* does not address the situation present here, in which the contract purportedly excuses the company from the duty that is the subject of the grievance. In both *ADT* and *Stericycle*, the Board's reasoning turned on the relationship (or lack of relationship) between what the contract excused and the information the union requested. The Board's unexplained attempt to recast *Stericycle* as a categorical rule about grievance-related information is arbitrary and capricious.

\*     \*     \*

The National Labor Relations Act's system of bargaining requires enforcement of the terms of collective bargaining agreements, including those provisions that narrow a union's information rights. We grant AMR's petition for review and deny the Board's cross-application for enforcement. We do not decide whether § 23.03 excused AMR, either directly or indirectly, from the obligation to respond to these information requests. Because these interpretive issues were not fully briefed, we vacate the order and remand for the Board to consider these issues in the first instance. The Board should also consider whether AMR forfeited or failed to exhaust this defense with respect to any of the information requests. As resolution of this threshold contractual issue may impact the other issues presented, we do not consider them here.

*So ordered.*