[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 23-11076

Non-Argument Calendar

_____

UNITED PARCEL SERVICE, INC.,

Petitioner-Cross Respondent,

*versus*

NATIONAL LABOR RELATIONS BOARD,

Respondent-Cross Petitioner.

_____

Petitions for Review of a Decision of the
National Labor Relations Board
Agency No. 02-CA-275560

_____

Before Rosenbaum, Jill Pryor, and Branch, Circuit Judges.

PER CURIAM:

United Parcel Service, Inc. ("UPS"), petitions for review of an order of the National Labor Relations Board ("Board"), which found that UPS committed unfair labor practices, in violation of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 *et seq.*, by refusing requests for information submitted by the International Brotherhood of Teamsters, Local 804 ("Union"). The Union represents workers at UPS facilities in New York. UPS petitions for review, disputing the Union's entitlement to the information and maintaining that it satisfied its good-faith duty to bargain. The Board cross-petitions for enforcement of its order. After careful review, we grant UPS's petition in part, remanding for further proceedings as explained below, and we enforce the Board's order in part.

## I. Factual Background

During its "peak" season each year, running from October 15 to January 15, UPS hires about 10,000 seasonal package helpers at its facilities in Westchester, Long Island, and New York City (excluding Staten Island). The seasonal employees are members of the bargaining unit at those facilities, represented by the International Brotherhood of Teamsters, Local 804 (the Union).

A national master agreement and a local supplemental agreement comprise the relevant collective bargaining agreement ("CBA") between the Union and UPS, effective August 2018 to July

2023.  Under the master agreement, UPS must supply the Union with a monthly list of new hires, including seasonal employees, "[i]n order to assist the Local Unions in maintaining current and accurate membership records."  The list provides each new hire's name, address, and Social Security number, among other information, but not email addresses or phone numbers.  UPS compiles this information in an Excel file and forwards it to the Union.

By the start of the 2020–21 peak season, following a lawsuit and grievances by seasonal employees, the Union suspected that UPS was not complying with CBA provisions governing seasonal-employee start times and wages.  In particular, it believed that UPS was erroneously calculating wages for seasonal employees based on when they delivered their first package, instead of when they reported for and began their work.

On January 21, 2021, the Union requested that UPS provide the following information for all seasonal employees hired from October 15, 2020, through January 15, 2021: (1) the employees' "phone numbers and/or email addresses"; and (2) "[a]ll documents reflecting report times for all seasonal employees, including but not limited to Daily Sign in sheet, security sign in sheets, and daily time sheets."  According to the Union's letter, it needed this information to "complete its investigation and prepare for any subsequent hearing involving [UPS's] violation of the CBA in regards to" these seasonal employees.

On February 3, 2021, UPS's Director of Labor Relations, Warren Pandiscia, emailed the Union's Director of Operations,

Joshua Pomeranz, stating that UPS did not have daily sign-in sheets, security sign-in sheets, or daily timesheets that reflected seasonal employees' reporting times, and that he was still "working on" the request for phone numbers and email addresses. In the weeks following this email, Pomeranz and Pandiscia discussed the request for contact information by phone, with Pandiscia emphasizing that the information was not systematically kept by UPS and would need to be manually extracted from individual job applications, which, in UPS's view, was overly burdensome. Pomeranz maintained that UPS had an obligation to provide the information.

During March and April 2021, Pomeranz and Pandiscia exchanged multiple emails regarding the Union's request for information. On March 9, Pomeranz sent a follow-up email to Pandiscia, asking whether UPS "intend[ed] to respond or provide the requested information." The same day, Pandiscia replied that he believed he had responded. Pomeranz said that he had not received any response. On March 16, Pomeranz re-sent the Union's January 21 information request. Pandiscia responded by asking what the request was in reference to, and whether it was associated with a grievance. Pomeranz replied that it "relat[ed] to the ongoing wage theft and separate agreements [UPS] makes with seasonal employees." Then, on April 7, Pomeranz asked for "a time frame or a clear rejection," and Pandiscia replied that he was working on the information request, among others, but did "not have direct access to the information" and could not identify a specific date when it would be provided. On April 12, Pandiscia wrote that the requests "were responded to." Pomeranz replied the same day and denied

receiving any response.  UPS ultimately did not produce any documents responsive to the information requests.

## II.  Procedural History

On April 8, 2021, the Union filed an unfair labor practice charge against UPS.  Following a hearing in early February 2022, an administrative law judge issued a decision finding that UPS violated § 8(a)(5) and (1) of the NLRA by failing to provide the requested information.  The ALJ found that the contact and report-time information was relevant.  And it rejected UPS's various defenses, including that (1) the Union wanted the information for use in arbitrations, rather than a bargaining matter; (2) the requested report-time information did not exist; (3) the Union sought contact information beyond the scope of the information-sharing provisions of the CBA; and (4) the contact information was unduly burdensome to compile.

UPS sought review by the Board, which affirmed the ALJ's decision.  The Board affirmed the ALJ's ruling on the requested report-time information for the reasons stated by the ALJ.  In particular, the Board noted that, while the "Union set forth three examples of possible sources of those report times," it made "clear that the sources specified were nonexhaustive by using 'included, but not limited to' language."  So in the Board's view, the Union was not required to modify its request when UPS responded that it did not have report times in any of the three explicitly listed sources, and UPS "was not entitled to limit its search for information in this manner."  The Board further found that UPS's "perfunctory

response to the Union's request for the information was not sufficient to satisfy its duty under the Act to make a reasonable, good faith effort to respond to the Union's information request."

Next, the Board rejected UPS's argument that the request for phone numbers and email addresses was unduly burdensome because it would require manually sorting through approximately 10,000 employment applications. The Board noted that, even if a search for records "would require a substantial expenditure of time and money, the burden of fulfilling the request is not a basis for an outright refusal," and the employer still has a duty to articulate its concerns to the union and offer to cooperate to reach a mutually acceptable accommodation, including about cost sharing. The Board found that UPS "did not demonstrate that fulfilling the Union's request would require a substantial expenditure of time and money, and the Respondent made no meaningful effort to bargain for a mutually acceptable accommodation with the Union," such as estimating the time or cost involved or putting forth "specific alternative suggestions for a possible accommodation." Accordingly, the Board found that UPS "failed to prove that the Union's request was unduly burdensome or that it made a sufficient effort to reach a mutually acceptable accommodation with the Union."

Finally, the Board rejected in a brief footnote UPS's argument that it was not required to provide the requested contact information because it went beyond the scope of the information-sharing provisions of the CBA. The Board asserted that "an

employer has a statutory duty to furnish information that goes beyond the scope of information that the contract requires it to furnish."

The Board ordered UPS to provide the Union with the information requested and to "[m]ake a reasonable effort to secure any unavailable information requested . . . and, if that information remains unavailable, explain and document the reasons for its continued unavailability." UPS petitions this Court for review, and the Board cross-petitions for enforcement.

## III.  Standards of Review

We review the Board's legal conclusions *de novo* and its factual findings for substantial evidence. *Mercedes-Benz U.S. Int'l, Inc. v. Int'l Union, UAW*, 838 F.3d 1128, 1134 (11th Cir. 2016); *see* 29 U.S.C. § 160(e), (f). Substantial evidence is more than a "scintilla," and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Cooper/T. Smith, Inc. v. N.L.R.B.*, 177 F.3d 1259, 1261–62 (11th Cir. 1999) (quotation marks omitted). "So long as the Board has made a plausible inference from the record evidence, we will not overturn its determinations, even if we would have made different findings upon a *de novo* review of the evidence." *Id.* at 1261. But "[w]hen the Board misconstrues or fails to consider important evidence, its conclusions are less likely to rest upon substantial evidence." *Northport Health Servs., Inc. v. N.L.R.B.*, 961 F.2d 1547, 1550 (11th Cir. 1992).

Although our review is deferential, "[w]e will not enforce a Board decision that fails to engage in reasoned decisionmaking."

*Int'l B'hood of Teamsters Local 947 v. N.L.R.B.*, 66 F.4th 1294, 1304 (11th Cir. 2023). "The Board's decision must be logical and rational, and our task is to examine carefully both the Board's findings and its reasoning, to assure that the Board has considered the factors which are relevant to its decision." *Ridgewood Health Care Ctr., Inc. v. N.L.R.B.*, 8 F.4th 1263, 1275 (11th Cir. 2021) (quotation marks omitted).

## IV. Discussion

An employer violates the NLRA if it "refuse[s] to bargain collectively with representatives of [its] employees," 29 U.S.C. § 158(a)(5), or "interfere[s] with . . . employees in the exercise of the rights guaranteed" by the NLRA, *id.* § 158(a)(1). In this regard, it is well established that an employer has a duty under the NLRA "to provide information that is needed by the bargaining representative for the proper performance of its duties." *N.L.R.B. v. Acme Indus. Co.*, 385 U.S. 432, 435–36 (1967).

In general, "[t]he key question in determining whether information must be produced is one of relevance." *N.L.R.B. v. U.S. Postal Serv.*, 888 F.2d 1568, 1570 (11th Cir. 1989). Information pertaining to bargaining unit employees is "presumptively relevant." *Id.* In determining the relevance of the requested information, the Board "need not decide the merits of the underlying dispute for which the information is being sought." *Id.* It is enough if the Board finds a "probability that the desired information [is] relevant, and that it would be of use to the union in carrying out its statutory desires and responsibilities." *Id.* (quotation marks omitted).

According to Board precedent, an employer may be excused from complying with a request for information if it "effectively rebuts the presumption of relevance" or "otherwise shows that it has a valid reason for not providing the requested information." *United Parcel Serv. of Am., Inc. (UPS)*, 362 N.L.R.B. 160, 162 (2015). For instance, an employer may have a legitimate claim that a request for information is "unduly burdensome or overbroad." *Id.* But "the burden in time and money necessary to fulfill a request for information is not a basis for refusing the request." *Pratt & Lambert, Inc.*, 319 N.L.R.B. 529, 532 (1995). Rather, the employer must "articulate [its] concerns to the union and make a timely offer to cooperate with the union to reach a mutually acceptable accommodation." *UPS*, 362 N.L.R.B. at 162. "[W]here an employer fulfills those obligations, the union may not ignore the employer's concerns or refuse to discuss a possible accommodation, even when the requested information is presumptively relevant." *Id.* At bottom, "[t]he parties must bargain in good faith as to who shall bear such costs." *Pratt & Lambert*, 319 N.L.R.B. at 532.

Because UPS raises distinct arguments as to the Union's two request for information, we consider each request separately.

## A. The Union's Request for Additional Contact Information

For starters, UPS does not dispute the Board's finding that the Union's request for "phone numbers and/or email addresses" for all seasonal employees hired from October 15, 2020, through January 15, 2021, was presumptively relevant, and it has not attempted to rebut that presumption. So the question is whether

UPS established "a valid reason for not providing the requested information." *UPS*, 362 N.L.R.B. at 162.

### 1. Undue Burden

UPS first argues that the request was unduly burdensome because it would have required manual review of more than 10,000 individual job applications, in part because such records were not required under the CBA. It further contends that it met its good-faith duty to bargain over an accommodation but was rejected out of hand by the Union.

Substantial evidence supports the Board's rejection of these arguments. Even assuming manually reviewing more than 10,000 applications represents a major expenditure of time and money, and so would ordinarily be considered unduly burdensome, "the burden in time and money necessary to fulfill a request for information is not a basis for refusing the request." *Pratt & Lambert*, Inc., 319 N.L.R.B. at 532.

And the record supports the Board's determination that UPS failed to bargain in good faith over an accommodation—assuming it was not excused from providing this information, which we address below. The record shows, as the Board stated, that UPS did not provide an estimate of the time or costs involved in producing the information, nor did it put forth alternative suggestions apart from a bare request from Pandiscia to "minimize the number of employees." UPS fails to explain how its proposed narrowing to the Union would have accommodated the Union's goals, nor is there any evidence that it attempted to bargain over the costs

involved in producing the information. Accordingly, the Board reasonably concluded that Pandiscia's communications, without more, fell short of showing that it "bargained in good faith in order to reach agreement on the scope of and cost-bearing aspect of producing the requested documents."

Because the Board "made a plausible inference from the record evidence, we will not overturn its determinations." *Cooper/T. Smith*, 177 F.3d at 1261; *N.L.R.B. v. Gaylord Chem. Co., LLC*, 824 F.3d 1318, 1325 (11th Cir. 2016) ("The Board's finding of an unfair labor practice must be upheld if it is based upon substantial evidence contained in the record taken as a whole, and based upon reasonable inferences drawn from the facts as found.") (quotation marks omitted). While UPS cites other evidence favorable to it, we are not persuaded that the Board overlooked or misconstrued important evidence. *See Northport Health Servs.*, 961 F.2d at 1550.

## 2. Contract Coverage

UPS next contends that it was excused from providing the requested contact information under the "contract coverage" doctrine, since the CBA already provided for the sharing of certain contact information for new hires, but not phone numbers or email addresses. In UPS's view, that provision fixed the parties' rights as to the provision of contact information for new hires, preventing the Union from unilaterally expanding the scope of that information through its later requests.

The "contract coverage" theory is a doctrine largely developed by the D.C. Circuit Court of Appeals, which stems from the

principle that courts and the Board "are bound to enforce lawful labor agreements as written." *N.L.R.B. v. U.S. Postal Serv.*, 8 F.3d 832, 836 (D.C. Cir. 1993). As explained by that court, the doctrine recognizes that "the duty to bargain under the NLRA does not prevent parties from negotiating contract terms that make it unnecessary to bargain over subsequent changes in terms or conditions of employment." *Id.*

Thus, a union "may exercise its right to bargain about a particular subject by negotiation for a provision in a collective bargaining contract that fixes the parties' rights and forecloses further mandatory bargaining as to that subject." *Id.* (quotation marks omitted). And "[w]hen a contract settles a union's rights, ordinary contract interpretation determines the scope of those rights." *Am. Med. Response of Conn., Inc. v. N.L.R.B.*, 93 F.4th 491, 496 (D.C. Cir. 2024); *see Wilkes-Barre Hosp. Co., LLC v. N.L.R.B.*, 857 F.3d 364, 376 (D.C. Cir. 2017) ("[W]hen parties negotiate for a contractual provision limiting the union's statutory rights, we will give full effect to the plain meaning of such provision."). The Board generally adopted the contract-coverage approach in 2019, under which it "will honor the parties' agreement, and in each case, it will be governed by the plain terms of the agreement." *See MV Transp., Inc.*, 368 N.L.R.B. No. 66, 2019 WL 4316958, *2 (Sept. 10, 2019). Previously, the Board had analyzed contract defenses under a waiver theory. *See id.*

The D.C. Circuit recently held that the statutory "duty to provide information," which is derivative of the duty to bargain,

"may be modified by agreement between employer and union," just like other subjects of collective bargaining. *Am. Med. Response*, 93 F.4th at 496. So when an employer makes a contractual defense that its duty to provide information was excused by the contract, the Board first "must determine whether a collective bargaining agreement relieves the employer of the duty to provide information." *Id.* That's consistent with the approach the Board has recently adopted. *See MV Transp.*, 368 N.L.R.B. No. 66, *2 ("[U]nder the contract coverage test we adopt today, the Board will first review the plain language of the parties' collective-bargaining agreement, applying ordinary principles of contract interpretation . . . .")

Here, though, the Board, in rejecting UPS's contract defense, did not conduct any analysis of the CBA to determine whether or in what circumstances it relieved UPS of the duty to provide information. And it declined to rely on the ALJ's "reference to the 'clear and unmistakable' and 'contract coverage' standards." Instead, the Board asserted in a footnote that "[t]he pertinent principle is that an employer has a statutory duty to furnish information that goes beyond the scope of information that the contract requires it to furnish."

While we agree with the Board that the "[t]he duty to furnish information is a statutory obligation which exists independent of any agreement between the parties," *U.S. Postal Serv.*, 308 N.L.R.B. at 359, that duty nevertheless "may be modified by agreement between employer and union," *Am. Med. Response*, 93 F.4th

at 496. *Cf. New Jersey Bell Tel. Co.*, 289 N.L.R.B. 318, 330 (1988) ("It is of course possible for a union to waive its right to relevant information."). Thus, as in *American Medical Response*, the Board "erred by putting the cart before the horse," concluding that UPS failed to provide requested information before determining whether UPS was excused from providing the information by the plain language of the parties' collective-bargaining agreement. *See id.*; *MV Transp.*, 368 N.L.R.B. No. 66, \*2.

The Board on appeal cites its precedent in *U.S. Postal Service*, which rejected an argument similar to the one UPS makes here. But that case was decided under a theory of waiver, not contract coverage. *See U.S. Postal Serv.*, 308 N.L.R.B. at 359 (finding no "clear and unmistakable waiver" for the right to additional information where the agreement "d[id] not provide that only that information shall be furnished"). And the Board has since made clear that waiver analysis is distinct from contract analysis. So we cannot simply swap the Board's analysis under a waiver theory for its analysis under a contract-coverage theory.

We express and imply no opinion about the merits of UPS's contract defense. We hold only that the Board did not engage in reasoned decisionmaking when it failed to determine whether the parties' CBA relieved UPS of the duty to provide information. *See Ridgewood Health Care Ctr.*, 8 F.4th at 1275; *see also Am. Med. Response*, 93 F.4th at 498 (noting that the Board "should also consider whether [the employer] forfeited or failed to exhaust this defense with respect to any of the information requests"). We therefore

grant UPS's petition as to this matter, set aside that portion of the Board's order, and remand for the Board to consider these matters in the first instance.

## B. *The Union's Request for Report Time Information*

The Board also concluded that UPS violated § 8(a)(5) and (1) in relation to the requested information about seasonal employees' report times. UPS maintains that it could not have violated the NLRA because it made a good-faith effort to look and no such documents existed. It also contends that the information was not relevant. We address each argument in turn, starting with relevance.

### 1. Relevance

UPS steadfastly maintains that it could withhold report-time information because, in its view, the purpose of the Union's request was solely meant to aid the seasonal employees' extra-contractual wage-theft claims, and to evade limitations on class-wide discovery. But "[t]he possibility that a union may use relevant information for a purpose the employer finds objectionable is no justification for withholding it." *N.L.R.B. v. CJC Holdings, Inc.*, 97 F.3d 114, 117–18 (5th Cir. 1996). And UPS's attempt to confine the request solely to extra-contractual matters is not supported by the record.[1]

---

[1] We reject UPS's reliance on the Supreme Court's decision in *Epic Systems Corporation v. Lewis*, 584 U.S. 497 (2018). While it appears UPS raised a similar argument before the Board, and so is not barred from presenting it on appeal, contrary to the Board's position on appeal, we fail to see the relevance of *Epic Systems* in this case. *Epic Systems* held that the NLRA could not be used to

16                     Opinion of the Court                23-11076

For starters, the ALJ found that the report time information was both presumptively and actually relevant. As noted above, the CBA contains provisions governing seasonal employees' start times and how they must be paid. Based on testimony at the hearing, the ALJ found evidence that "the Union had reason to suspect that seasonal employees were not being paid correctly"—that is, that they were being paid from the time their first delivery was recorded, rather than their actual start time—"and to investigate the matter by requesting their report times." That finding was adopted by the Board. Aside from asserting that employees are not paid based on their report times, UPS entirely fails to engage with this reasoning in its briefing on appeal. So it has not shown that substantial evidence does not support the Board's finding that the report time information was relevant to the Union's statutory duty to investigate potential violations of the CBA.

Instead, UPS contends that it reasonably understood the information request to relate to only certain extra-contractual claims being pursued by former UPS employees. *See, e.g.*, *The Fremont-Rideout Health Grp.*, 357 N.L.R.B. 1899, 1906 (2011) (finding no violation of the NLRA where the employer "reasonably construed the information request to refer to [an] unfair labor practice charge," not to the union's bargaining unit responsibilities). But it's not

_____

invalidate or abrogate arbitration agreements limiting class-wide relief. *See* 584 U.S. at 502–03, 525. It says nothing at all about requests for information. *See, e.g.*, *id.* at 521 (noting that the rights protected by the NLRA "stand every bit as strong today as they did yesterday").

clear how the requested information was even relevant to the extra-contractual claims. As the ALJ noted, UPS did not "articulate how the Union would use information regarding the 2020–2021 peak season in wage arbitrations brought by employees who did not work that season," and it has not done so on appeal. Nor do we think it reasonable for UPS to believe that the Union's stated concern with "wage theft" related to only extra-contractual matters. As we just explained, the Union's statutory representational duties encompassed investigating whether UPS had violated CBA provisions governing start times and wages—or more informally, had engaged in wage theft. Its information request claimed the information was needed for its investigation about and potential future hearings on "violations of the CBA." And its later communications with UPS did not contradict that stated purpose. For these reasons, UPS has not shown that the Board's resolution of these matters was unsupported by substantial evidence or otherwise contrary to law.

### 2. Unavailability

There is no dispute that an employer cannot be expected to provide information it does not have. "But employers do have an obligation to make reasonable efforts to secure any unavailable information." *Sara Lee Bakery Grp., Inc. v. N.L.R.B.*, 514 F.3d 422, 429 (5th Cir. 2008). In particular, in responding to requests for relevant information, the employer must "provide the information in its possession, make a reasonable effort to secure any unavailable information, and, if any information remains unavailable, explain

and document the reasons for its continued unavailability." *Garcia Trucking Serv., Inc.*, 342 N.L.R.B. 764, 764 n.1 (2004).

Here, substantial evidence supports the Board's finding that UPS failed to comply with its duties in this regard. The Union requested "[a]ll documents reflecting report times for all seasonal employees, including but not limited to Daily Sign in sheet, security sign in sheets, and daily time sheets." Thus, the request on its face was not "limited to" the three listed sources of report time information. But Pandiscia's response, on behalf of UPS, *was* limited to those sources—stating that UPS "does not have daily sign in sheets, security sign sheets or daily time sheets that reflect reporting times for seasonal employees"—and ignored the overarching request for "[a]ll documents reflecting report times." And UPS does not identify any evidence to contradict the ALJ's finding that "the evidence does not indicate that the Respondent looked for all potential sources of seasonal employee report times other than the sources suggested by the Union."[2]

Thus, we agree with the Board that Pandiscia's email response does not reflect a "reasonable effort to secure any unavailable information." *Garcia Trucking*, 342 N.L.R.B. at 764 n.1. And Pandiscia's oral comment that UPS "does not memorialize what time people show up to work" was little more than a bare denial.

---

[2] UPS suggests that the ALJ, on this point, was referring to text messages which, according to UPS, would not have been available to UPS or shown report times. But regardless, UPS cites no evidence that it conducted an inquiry beyond the sources named by the Union.

There is no evidence that UPS "explain[ed] and document[ed] the reasons for its continued unavailability" to the Union, *Garcia Trucking*, 342 N.L.R.B. at 764 n.1, including, for example, the steps Pandiscia took to obtain the information, that some of the information would not "reflect if the employee's a seasonal employee or not," and that some information was not retained for more than 30 days.[3] Accordingly, the Board reasonably concluded based on the record that UPS's "perfunctory" response to the Union's request for report time information violated § 8(a)(5) and (1).

## V.  Conclusion

In sum, we grant UPS's petition in part and deny it in part. We hold that the Board failed to engage in reasoned decisionmaking with respect to UPS's contract defense to the request for additional contact information, so we grant UPS's petition as to those violations, deny the Board's petition for enforcement, and remand for further proceedings.  We otherwise conclude that the Board's rejection of UPS's claim of undue burden was supported by substantial evidence.  As for the violations stemming from the request for report-time information, we deny UPS's petition and grant the Board's petition for enforcement.

---

[3] At most, Pandiscia testified that he explained to the Union "numerous times" that "daily time cards expire or time out after two and a half weeks," but there is no similar testimony that he communicated problems with other sources of information, or other unnamed sources of information, to the Union.

**Petition GRANTED IN PART and DENIED IN PART. Cross-petition for enforcement GRANTED IN PART and DENIED IN PART.**